**In re RIVER OAKS FURNITURE, INC., R.O. East, Inc., Gaines Manufacturing Co., R.O. West, Inc.**

**River Oaks Furniture, Inc., Plaintiff,**

**v.**

**BDO Seidman, BDO Seidman, LLP, Jerome Walsh, Walsh Communications, Inc., Ronald G. Ashby, James B. Cross, Eileen M. McGinley, Leland E. Graul, Jack A. Weisbaum, and Scott M. Univer, Defendants.**

**Bankruptcy Nos. 98–21152 to 98–21155. Adversary No. 98–2172.**

United States Bankruptcy Court, N.D. Mississippi.

April 4, 2001.

See also 276 B.R. 501.

James W. Newman, IV, Jackson, MS, Thomas D. Keenum, Sr., Booneville, MS, James M. Tutor, Booneville, MS, Walter H. Boone, Jackson, MS, for Debtors.

DAVID W. HOUSTON, III, Bankruptcy Judge.

## OPINION OUTLINE

I. Jurisdiction ....................................................511

II. Pretrial Order—Summary of Claims........................................511

III. Pretrial Order—Stipulations ............................................512

IV. Synopsis of Remaining Issues ............................................513

V. The Plaintiff's Claims for Damages Relative to the Allegations of Audit Malpractice in the Years 1991 Through 1995................................515

VI. The Events That Occurred in 1997 That Led to the Resignation of BDO From the Audit Engagement ............................................517

VII. The Claim for Damages Relative to the Allegations of Disparagement and Libel Resulting From the *Furniture Today* Article, Which Was Published on September 8, 1997............................................524

VIII. BDO's Counterclaim for Fees and Expenses Incurred in the Remedial Work on the Symix Computer System........................................525

IX. BDO's Counterclaim for Damages Resulting From the Fees and Expenses Incurred During Its Investigative Work Following the Discovery of Defalcations in the River Oaks' Financial Records in 1997 .........................530

X. Damage Quantification and Attribution ....................................530

 A. Expert Witnesses—Kenneth Naglewski Dr. Gary French Jaques Belet, III Mike Benston .........................................................531
 B. The Financial Downslide of River Oaks ................................536
 C. The Timing of the River Oaks Bankruptcy Filing .........................539
 D. Quality Control Concerns ............................................539
 E. Other Economic Events .............................................540
 F. Unfavorable Publicity Generated in *Furniture Today* Article ..............541
 G. The Acquisition and Destruction of Gaines Manufacturing Company.........542
 H. Relationship with BNY .............................................544

XI. Conclusions ...........................................................545
 A. Contributory Negligence/Comparative Negligence .......................545
 B. Audit Interference ................................................547
 C. Proof of Damages Within a Reasonable Degree of Certainty ..............549
 D. River Oaks' Fate was Inevitable ....................................550
 Order ...........................................................551

## OPINION

On consideration before the court is the third amended complaint filed by the plaintiff, River Oaks Furniture, Inc., referred to hereinafter as River Oaks, against the defendants, BDO Seidman, BDO Seidman, LLP, Jerome Walsh, Walsh Communications, Inc., Ronald G. Ashby, James B. Cross, Eileen M. McGinley, Leland E. Graul, Jack A. Weisbaum, and Scott M. Univer, referred to hereinafter collectively as BDO; a timely answer, affirmative defenses, and counterclaim having been filed by the said defendants; on proof in open court; and the court, having heard and considered same, hereby finds as follows, to-wit:

## I.

The court has jurisdiction of the parties to and the subject matter of this proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. This matter would primarily be defined as a "non-core" proceeding. However, the parties have agreed that this court may enter all appropriate orders and judgments as contemplated by 28 U.S.C. § 157(c)(2), subject to appellate review as specified in 28 U.S.C. § 158.

## II.

In the pretrial order, the parties summarized their respective positions and claims as follows:

A. The plaintiff, River Oaks:

1. River Oaks has alleged a claim against BDO Seidman, the general partnership, Weisbaum, Graul, Cross, and Ashby, as general partners, and BDO Seidman, LLP, and Ashby, individually, for professional malpractice, negligence, and breach of contract in connection with the audits performed for the years 1991 through 1995. River Oaks seeks actual damages, punitive damages, attorney fees, pre and post judgment interest, and all other appropriate relief on this claim.

2. River Oaks has alleged a claim against BDO Seidman, LLP, Weisbaum, Graul, Cross, McGinley and Univer for professional malpractice, negligence, breach of contract, breach of fiduciary duty, conspiracy, and fraud in connection with BDO's 1996 audit and subsequent events in 1997. River Oaks seeks actual

damages, punitive damages, attorney fees, pre and post judgment interest, and all other appropriate relief on this claim.

3. River Oaks has alleged a claim against BDO Seidman, LLP, Weisbaum, Graul, Cross, McGinley, Univer, Jerome Walsh, and Walsh Communications, Inc. for defamation, disparagement, libel and slander in connection with the September 8, 1997 *Furniture Today* article. River Oaks' claim against Weisbaum and Graul on this count is contingent upon the court finding that a conspiracy existed and BDO's statements to *Furniture Today* article were undertaken in furtherance of that conspiracy. River Oaks seeks actual damages, punitive damages, attorney fees, pre and post judgment interest, and all other appropriate relief on this claim.

4. River Oaks has alleged a claim against BDO Seidman, the general partnership, Weisbaum, Graul, Cross, and Ashby (as general partners) for professional malpractice, negligence, and breach of contract in connection with the selection and implementation of the management information system. River Oaks seeks actual damages, punitive damages, attorney fees, pre and post judgment interest, and all other appropriate relief on this claim.

B. The defendants, BDO:

1. Breach of contract, or in the alternative, unjust enrichment in connection with the Symix project for sums in excess of $2,000,00.00, expended by BDO personnel from 1995 to 1997 in completing and bringing on-line the Symix computer system plus sums of money paid in addition by BDO on a shared basis to outside vendors;

2. Breach of contract in failing to pay for services rendered as requested by River Oaks in an amount in excess of $170,000.00;

3. Fraud connected with the Kim Long falsification of financial statements pre- sented for the purpose of deceiving BDO as auditor of River Oaks;

4. Breach of the representations and warranties of River Oaks to BDO in the presentation of financial statements not presented in accordance with generally accepted accounting principles;

5. Other failures on the part of River Oaks to disclose timely such fraudulent activities and irregularities and misrepresentations to BDO;

6. Breach of covenant of good faith and fair dealing related to the contract for auditing services.

Both on the original claim and the counterclaim, damages are sought both for compensatory and punitive damages, as well as, costs, expenses, and attorneys' fees.

### III.

In the pretrial order, the parties stipulated to the following:

A. BDO Seidman, LLP is the successor to, and assumed the liabilities of, BDO Seidman, the general partnership. BDO Seidman, LLP, became effective on July 1, 1995.

B. Weisbaum, Graul, Cross, and Ashby were general partners of BDO Seidman, the general partnership, at least from 1990 until it became BDO Seidman, LLP, on July 1, 1995.

C. Univer is not a partner in BDO Seidman, LLP, and was not a partner in BDO Seidman, a general partnership.

D. McGinley was never a partner in BDO Seidman, a general partnership.

E. From approximately August, 1993 through January, 1998, Johnny Walker served as Chief Financial Officer of River Oaks and during a portion of that time served as Chief Operating Officer of River Oaks.

F. Kim Long served as accounting manager of River Oaks from the early 1990's until the spring of 1996 when she became credit manager. She also served as an assistant secretary of River Oaks from April 26, 1995, until her resignation in April, 1997.

G. If called to testify in this matter by either or both parties, Kim Long would assert her Fifth Amendment privilege against self-incrimination. Counsel may assume, unless otherwise directed by the court, that Kim Long will continue to invoke the Fifth Amendment privilege against self-incrimination and will not be required to subpoena her at trial for purposes of establishing her ongoing invocation of her Fifth Amendment privilege. This stipulation shall be ineffective if Kim Long does testify without invoking her Fifth Amendment privilege.

H. Kim Long confessed on April 10, 1997.

I. BDO first provided access to its work papers to Horne Group on July 1, 1997.

J. On October 15, 1997, River Oaks filed its Annual Report, Form 10–K, containing its 1996 audited financial statements with Horne CPA Group's unqualified independent auditors' report.

K. River Oaks' stock was delisted by NASDAQ for failure to meet NASDAQ's listing requirements on August 20, 1997, by failing to file its Annual Report on Form 10–K for period ended December 31, 1996, containing its audited annual financial statements and its quarterly reports on Form 10–Q for the periods ending March 31, 1997, and June 30, 1997, with the SEC and NASDAQ on August 20, 1997.

L. The parties acknowledge some trial exhibits offered into evidence contain hearsay information of which the author has no personal knowledge, or portions which might otherwise be independently inadmissible. Rather than object to the entire exhibit because it may contain hearsay or otherwise inadmissible evidence, the parties stipulate that the trial exhibit may be received into evidence. However, the court may give the objectionable portion of the exhibit whatever weight it deems appropriate. By allowing introduction into evidence of the entire trial exhibit, neither party will be deemed to have waived any objection to the weight which the court should accord those portions of the exhibit which contain objectionable material.

M. Either party may offer into evidence additional pages of deposition testimony not listed in the Pretrial Order upon reasonable notice to counsel opposite. Notice shall be sufficient such that counsel opposite can determine what, if any, additional excerpts from deposition testimony it may offer in response. Additional deposition testimony will be allowed as long as the offering party has made a good faith attempt to originally designate all relevant deposition testimony.

N. Either party may offer into evidence additional documents not listed in the pretrial order upon reasonable notice to counsel opposite. Notice shall be sufficient such that counsel opposite can determine what, if any, additional documents it may offer in response. Additional documents will be allowed as long as the offering party has made a good faith attempt to originally designate all relevant documents.

## IV.

At the conclusion of the plaintiff's proof, the court, following a motion made by the defendants pursuant to Rule 52, Federal Rules of Civil Procedure, dismissed the following claims set forth by the plaintiff in its third amended complaint, to-wit:

A. The "conspiracy/control group" allegations against the individual defendants, Univer, Weisbaum, Graul, Cross, and McGinley.

B. The plaintiff's claims for punitive damages and attorneys' fees.

The court saw no evidence that a conspiracy had been orchestrated or that one existed among the individual defendants. Indeed, as will be set forth more fully hereinbelow, the court concluded that these parties acted appropriately after learning that defalcations had occurred in the River Oaks' financial records which had not been detected by the BDO annual audits. In addition, the court concluded that the evidence was insufficient to establish any malicious or egregious conduct on the part of the defendants that could sustain a claim for punitive damages. Since these claims were dismissed, and in the absence of a contractual agreement to pay attorneys' fees, the claim for fees likewise was dismissed. In making these decisions, the court dictated a bench opinion into the record on February 19, 2001, the transcribed copy of the said opinion is incorporated herein by reference.

Prior to the trial, the court, on a motion for summary judgment filed by the defendants, dismissed that part of the plaintiff's third amended complaint seeking damages related to the selection and implementation of the Symix computer system project. This occurred primarily because the plaintiff indicated that it could not quantify its damages relative to this part of the complaint through its anticipated expert testimony. The court's opinion and order sustaining the defendants' motion for summary judgment are incorporated herein by reference.

In the pretrial order, the defendants indicated that they were also requesting punitive damages and attorneys' fees as a result of their counterclaim. The court is of the opinion that the defendants have shown no malicious or egregious circumstances in the plaintiff's conduct that would merit such awards. As such, the defendants' claims for punitive damages and attorneys' fees will be dismissed.

Following the aforementioned decisions, the cause of action narrowed to the following issues:

A. The plaintiff's claims for damages relative to the allegations of audit malpractice, negligence, and breach of contract in the years 1991 through 1995.

B. The plaintiff's claims for damages relative to the allegations of professional malpractice, negligence, breach of contract, breach of fiduciary duty and fraud concerning the 1996 audit and the financial statement events, occurring in 1997, to-wit:

1. The failure of BDO to complete the 1996 audit, the SEC Forms, and issue an audit opinion.

2. The withdrawal by BDO of its previous audit opinions. (The court notes, parenthetically, that the withdrawal of the previous audit opinions was necessitated by the notice to NASDAQ and/or the Securities and Exchange Commission (SEC), initiated by River Oaks, that its previous financial statements were incorrect. This, of course, must be tempered by the fact that had River Oaks corrected its prior financial statements that they could have perhaps been re-audited by BDO.)

3. The resignation of BDO from the audit engagement.

4. The resulting de-listing of River Oaks by NASDAQ.

5. The unfavorable publicity generated for River Oaks as a result of the *Furniture Today* article which mentioned "collusive fraud."

C. The plaintiff's claim for damages relative to the allegations of disparagement and libel resulting from the *Furniture Today* article, which was published on September 8, 1997, which mentioned, as noted hereinabove, "collusive fraud."

D. BDO's counterclaim for damages resulting from the fees and expenses incurred by BDO in the remedial work on the Symix computer system after the unsuccessful "go live" attempt in July, 1995. This claim totals $2,267,691.00.

E. BDO's counterclaim for damages resulting from the fees and expenses incurred by BDO during its investigative work following the discovery of defalcations in the River Oaks financial records in 1997. This claim totals $170,420.00.

V.

*The Plaintiff's Claims for Damages Relative to the Allegations of Audit Malpractice in the Years 1991 Through 1995*

Without question, Kim Long, the River Oaks accounting manager who became credit manager, committed defalcations in the River Oaks financial records for several years. Some, but not all, of her manipulations are addressed in the affidavit prepared by the Waller Lansden Dortch & Davis (Waller Lansden) law firm following her confession on April 10, 1997. See Exhibit 153. A more detailed explanation of the effect of these manipulations can be found in the expert witness report of Monroe M. Wright, which was introduced into evidence as Exhibit 3034, as well as, the expert witness report of Michael C. Odom, which was introduced into evidence as Exhibit 1741. Some glaring examples of Long's handiwork are set forth as follows:

A. In examining the 1991 factor accounts receivable reconciliation, Exhibit 173, the BDO field auditor observed that assignments 1096 and 1097 had been in-

flated by the total amount of $196,956.98. When the auditor advised Kim Long of this discrepancy, Long simply prepared a second reconciliation, corrected the amounts of assignments 1096 and 1097, but inflated a third assignment, 2001, to the sum of $273,906.78. See Exhibit 172. Assignment 2001 had originally been listed by Long on the first reconciliation, Exhibit 173, as $76,949.80. The amount of the elevation to assignment 2001 on Exhibit 172 was exactly $196,556.98. Ironically, the actual amount of assignment 2001 was only $949.80, as set forth on Exhibit 490, the factor's statement. The BDO auditor apparently accepted Long's explanation without further inquiry.

B. Attached to Long's affidavit was a version of the operating account reconciliation dated December 26, 1992, prepared by River Oaks' employee Donna Graham. See Exhibit A to Exhibit 153. Long altered this reconciliation, reducing the negative cash balance by $1,439,100.51. ($3,997,425.97 less $2,558,325.46) See Exhibit B to Exhibit 153. See also Exhibit 184. Both of these reconciliations were reviewed by Walter Billingsley in February, 1997. Billingsley noticed that the "held checks" on the document prepared by Long exceeded the total of the "outstanding checks" which, as recognized by Billingsley, was an impossibility. Billingsley promptly brought this to the attention of River Oaks' Chief Financial Officer/Chief Operating Officer Johnny Walker. However, neither told anyone else for several weeks.

C. Exhibit 163 is a BDO workpaper pertaining to the River Oaks' factor accounts receivable reconciliation dated December 31, 1994. It reflects the tick marks and footnotes written on the document by the auditor. Exhibit 882 is the identical River Oaks' reconciliation without the tick marks and footnotes. In early

1997, Billingsley requested and obtained Exhibit 882 from BDO. He then compared this document to the CIT factored accounts statement dated January 28, 1995, Exhibit 164. Billingsley immediately observed Long's misstatements on the reconciliation. For example, assignment 4755 was depicted as $1,479,803.11 on the reconciliation as compared to $479,803.11 on the CIT statement. Assignment 4759 was depicted as $1,203,001.10 on the reconciliation as compared to $203,001.10 on the CIT statement. This, of course, was not detected by the BDO auditor who reportedly examined these records in 1995.

D. Exhibit 167 is a BDO workpaper with tick marks and notes pertaining to the River Oaks' factor accounts receivable reconciliation dated December 31, 1995. Exhibit 517 is a copy of this same document without the tick marks and notes which was prepared by Kim Long. This document was purportedly vouched to a CIT "print screen" which disappeared and could not be located. Had this document been vouched to Exhibit 169, the CIT statement, dated January 31, 1996, the BDO auditor could have observed that six entries on the reconciliation had been inflated in the assignments in transit section.

E. For the year ended December 31, 1995, Long misstated the debt owed to CIT by the sum of $1,490,000.00. See Exhibits 1385 and 1386. She told the BDO auditor that CIT had collected this amount of money, but had not yet posted the collection to its statement. The auditor apparently accepted this without verification to subsequent CIT records.

According to the testimony, Long manipulated cash for four years, accounts receivable for four years, and understated the River Oaks' debt in one year. Not only did she alter the cash and factor accounts receivable reconciliations, she forged underlying documents to which the BDO auditors were vouching. All of these defalcations led to an "out of balance" problem in the River Oaks' books as of December 31, 1996, in the approximate sum of $7,195,000.00. This number was extracted from the testimony of BDO auditor Marlene Rabinowitz. See also Exhibits 176 and 178, the "creep sheets," which were prepared by BDO auditors, Dave Cannon and James Cross.

The "creep sheet" numbers may or may not include the $2,742,919.56, journal entry made by Mike Tuttle in early 1996 to reduce the River Oaks' cash account as of December 31, 1995. Regardless, this journal entry was approved by BDO auditor Richard Gill on February 21, 1996. See Exhibit 525.

While Long was guilty of manipulating the River Oaks' records for no explained reason, the BDO auditors were clearly remiss in their ability to detect the defalcations. As mentioned hereinabove, Monroe Wright discussed the ineffective audit procedures and practices in his report. These inefficiencies were also confirmed by Joseph Coates, a BDO partner, in his litigation review of the 1991, 1992, and 1993 audits, BDO partners Ron Ashby and Jack Weisbaum, as well as, by expert witnesses Michael Odom and Mike Benston.

On cross-examination, one of the attorneys representing River Oaks posed a pertinent question to Mike Benston, a BDO expert witness. The question, which was not answered and which is paraphrased herein by the court, was, "If these matters had been caught by BDO, the events of 1997 would not have happened, would they?" Without doubt, a $7,195,000.00 "out of balance" number is substantial. Although it was "created" through the subterfuge perpetrated by Kim Long, it was not "caught" by BDO. In the opinion of the court, it should have been. This "out of balance" problem contributed, in part, to

the financial statement events of 1997, particularly the inability of BDO to complete the 1996 audit, the inability to timely file the SEC Form 10–K, and the ultimate resignation of BDO from the audit engagement. According to the testimony of James Cross and Eileen McGinley, BDO did not then and has not now solved this conundrum.

■ Although the audits "as a whole" may not have violated Generally Accepted Auditing Standards (GAAS) or Generally Accepted Accounting Principles (GAAP), as opined by Michael Odom and Mike Benston, the negligence, which can be attributed to the BDO field auditors, contributed to BDO's inability to perform its auditing responsibilities in 1997. The damage to River Oaks caused by the audit malpractice, however, must be appropriately quantified considering the totality of the economic circumstances confronting River Oaks during this period of time, as well as, that the defalcations, which were the actual "genesis" of the audit malpractice, were perpetrated by a River Oaks' employee.

To further clarify this issue, the court would mention that it understands that contractually BDO had a duty to perform its audits in compliance with Generally Accepted Auditing Standards. Correspondingly, River Oaks contractually had a duty to present to BDO, for auditing purposes, financial statements that were prepared in keeping with Generally Accepted Accounting Principles. Being mindful of these respective obligations, the court concludes that River Oaks' claims for malpractice are more appropriately based on negligence rather than breach of contract. The court reaches this conclusion in reliance on the expert testimony of Michael Odom and Mike Benston who both opined, as noted immediately hereinabove, that the BDO audits "as a whole" complied with Generally Accepted Auditing Standards. There was ample evidence, however, from several sources that the BDO auditors were, indeed, negligent in their audits of cash and receivables.

## VI.

### *The Events That Occurred in 1997 That Led to the Resignation of BDO From the Audit Engagement*

The most appropriate way to address this issue is to review the "time lines" set forth in the reports generated by Michael Odom, Exhibit 1741, and Mike Benston, Exhibit 5933, to-wit:

| | |
|---|---|
| July 26, 1996 | River Oaks changed factors from CIT to Bank of New York Financial Corporation ("BNY"). CIT was paid $33,369,172.92. (Exhibits 266 and 265) |
| September, 1996 | BNY requested River Oaks to "gross up" debt on the River Oaks' balance sheet. |
| Early October, 1996 | Mike Tuttle attempted to reconcile the components of debt and was unable to do so. |
| First week of November, 1996 | Mike Tuttle told Johnny Walker that he was unable to reconcile debt on a gross basis. (Johnny Walker 30(b)(6) deposition, page 460) |
| December, 1996 | Johnny Walker formed a team of River Oaks' personnel (Walter Billingsley, Mike Tuttle, Kim Long and Johnny Walker) to look into the problem. |
| January 23, 1997 | BDO partners, Eileen McGinley and Valerie Kozikowski, were advised of the "debt" problem by River Oaks Chief Financial Officer and Chief Operating Officer, Johnny Walker, who told them about a "Dangling Debit." Walker stated that the River Oaks accounts were "out of balance," indicating that the problem was an unknown debit. However, Walker assured them that this situation was not serious. |
| Late January, 1997/ Early February, 1997 | Walter Billingsley determined that the 1994 factor accounts receivable reconciliation pre- |

| | |
|---|---|
| | pared by Kim Long was incorrect. He shared this information with Johnny Walker. |
| Early February, 1997 | Walter Billingsley obtained the 1992 bank reconciliation that was contained in BDO's work papers and discovered that it differed from the bank reconciliation in River Oaks' files. Billingsley shared this information with Johnny Walker. |

As noted in the Odom report, this is a key event that would indicate a potential fraud and breakdown in the River Oaks' internal controls. Neither Walker nor Billingsley disclosed this information or the forced documents to BDO. BDO first learned of the incorrect bank reconciliations for 1991 and 1993 on March 5, 1997, and learned that there were two versions of the 1992 bank account reconciliation in April, 1997, when informed by Steve Page of Ernst & Young.

| | |
|---|---|
| First Week of February, 1997 | During the later part of the first week of February, Eileen McGinley learned that there were differences between the in-transit assignments shown on the 1994 BDO audit work papers and the actual in-transit items as reflected on information received from the factor, CIT. Johnny Walker asked for assistance and McGinley began efforts to locate a factoring expert. Walker indicated that he believed that the problems were related to CIT errors. He also requested McGinley to analyze the acquisition of Gaines Manufacturing Company as a potential source for the discrepancy. |
| February, 1997 | McGinley advised Walker about the 1994 factor accounts receivable reconciliation. She showed and explained to him the BDO workpaper which contained the tick marks and footnotes. |
| February 14, 1997 | BDO factoring expert and partner, Jack Weisbaum, came to River Oaks to review the available information in order to assist with the problems in reconciling the factor accounts receivable reconciliations. Weisbaum concluded that fraud had occurred with respect to the 1994 and 1995 reconciliations. |

| | |
|---|---|
| February 18, 1997 | McGinley arranged for a meeting with Steve Simons, River Oaks' CEO, Walker, and Weisbaum. She asked Walker if he intended to inform the River Oaks Board of Directors of the $2.8 million unreconciled difference in the factor account. Walker indicated that he had discussed this issue with Simons and Thomas Keenum, the River Oaks' General Counsel. Walker stated that Keenum had related to him that the River Oaks board did not have to be advised until Walker had ascertained more information. |
| February 20, 1997 | At the request of Mike Tuttle, the River Oaks' Controller, the BDO audit team left the premises of River Oaks, having completed a substantial portion of the audit. They left a list of "open items" with the River Oaks' accounting staff. The staff was supposed to respond to these items and furnish the information developed to BDO audit manager Dave Cannon. See Exhibit 175. Subsequently Cannon received a memorandum from Mark Stegall indicating that the "open items" list was getting no attention by the River Oaks' accounting staff. See Exhibit 174. |

Tuttle requested the BDO audit team to leave the premises so that field examiners from BNY, River Oaks' newest lender, could have access to inspect the River Oaks' financial records. The BDO audit team was not asked to return to River Oaks until April 9, 1997.

| | |
|---|---|
| February 24, 1997 | Jack Weisbaum, Eileen McGinley, and Jim Cross met with Steve Simons and Johnny Walker to discuss the perceived irregularities. BDO indicated to Simons and Walker that the factor accounts receivable reconciliations appeared to be purposely forced and that there could be elements of fraud. Walker advised the group that he thought there was still an "innocent explanation" for the problem and he attempted to locate the CIT "print screen." |

In his trial testimony, Simons stated that he was told by the BDO representatives that they "suspected accounting ir-

regularities," but he did not recall that they mentioned "fraud." However, in his state court deposition taken in 1998, to which he made no corrections, Simons stated that Weisbaum mentioned "fraud" at the February 24, 1997, meeting. Simons testified that Walker was "in charge" of the investigation into the accounting irregularities from River Oaks' perspective. In the opinion of the court, this scenario could be likened to placing the "fox in charge of the hen house."

Simons was copied on a memorandum of the meeting, prepared by Cross on February 25, 1997, Exhibit 369. This was also disseminated to Walker. This memo contained the use of the following words: "plug," "purposely forced," and "elements of fraud."

 In the opinion of the court, Simons was adequately warned of the seriousness of the situation existing in the River Oaks accounting records. At this time, Walker already knew what had happened, who the "culprit" was, and failed to disclose any of this information to BDO. Since Walker was the Chief Financial Officer/Chief Operating Officer of River Oaks, this knowledge is imputable to River Oaks.

| | |
|---|---|
| February 26, 1997 | Billingsley determined that the 1992 bank reconciliation presented to BDO was incorrect, and he informed Walker of the same. |
| Late February, 1997 | BNY conducted a field examination of the River Oaks' records and concluded that debt was understated by $7.3 million. Greg Kulikowski informed Mike Tuttle of this finding. (Exhibit 317 and Kulikowski's deposition, pages 40, 41, 48, 49, 53, 54, and 55) |
| March 3, 1997 | William McIntosh of BNY contacted McGinley and informed her that the River Oaks debt account with BNY was out of balance by $7.3 million. (Exhibit 850) |
| March 4, 1997 | McGinley and Cross met with Walker to discuss the differences in the factor receivable |

| | |
|---|---|
| | account. McGinley and Cross advised Walker that he needed to discuss the entire matter with River Oaks' SEC counsel. |
| March 5, 1997 | McGinley and Cross again met with Walker to discuss the 1991 and 1993 River Oaks bank reconciliations. Cross, in his memorandum of this meeting, indicated that he had reiterated his concern to Walker about the reconciliation problem and the fact that the bank reconciliation appeared to have been forced. Walker responded that he still did not believe that there was any fraud involved. |
| | McGinley and Cross told Walker that it was time to have a meeting with the River Oaks audit committee and requested that the meeting be scheduled for March 10, 1997. Because Simons, who wanted to attend the audit committee meeting, was unavailable, the meeting was postponed until March 17, 1997. |
| March 17, 1997 | McGinley and Cross met with the River Oaks audit committee. Cross stated the following in his memorandum of the meeting, Exhibit 75, to-wit: "There were a number of questions from the two directors present regarding our past audit procedures and how reconciliation errors could have gone undetected. I told them that we were in the process of reviewing our audit procedures and we would have some answers at some future date, but the independent investigation would also most likely shed light on those issues." |

The agenda for the audit committee meeting was informative. The following language was extracted from Exhibit 424: "Concluded that A/C was overstated by $2.8 million." "Appear to have been manipulated (forced)." "Virtual total breakdown in internal control systems, or one or more people purposely forced reconciliations for some unknown reason, or both." "Management has asserted that their belief is that no fraud occurred."

Dr. Gerald Turner, the former Chancellor at the University of Mississippi and

now President of Southern Methodist University, was the chairman of the River Oaks' audit committee. In his discovery deposition, the following statements regarding the March 17, 1997, audit committee meeting were extracted:

BDO brought forward a concern that there might be some "willful malfeasance." The books had been inappropriately reconciled. Page 102.

BDO's general direction was that there was fraud. There was some malfeasance involved and we needed to get help to determine who was the culprit. Page 167.

From the deposition testimony of Dr. Turner and the language that appeared on the audit committee meeting agenda, this court is of the opinion that River Oaks was clearly advised that fraud or serious accounting manipulations, including forced entries, had occurred. Indeed, at the recommendation of BDO, the audit committee decided to employ an independent outside investigator.

| | |
|---|---|
| March 18, 1997 | The River Oaks audit committee passed a resolution to engage the Waller Lansden law firm to conduct an investigation of the events in question and to determine who might be responsible. This was communicated to BDO on March 19, 1997. |
| March 24, 1997 | Waller Lansden engaged the accounting firm of Ernst and Young to assist in the investigation. The actual investigation did not commence until April 3, 1997. |
| March 31, 1997 | Joseph Coats, a BDO partner in Orlando, substantially completed his "litigation review" of the 1991, 1992, and 1993 audit work papers. The report of his review, dated April 11, 1997, Exhibit 429, confirmed significant audit deficiencies. |
| March 31, 1997 | This was the due date of the River Oaks SEC Form 10–K. River Oaks filed a Form 12–B–25 requesting an extension of the filing deadline, which stated, "The Company recently undertook a detailed analysis of certain of its accounts and its accounting reconciliation procedures. This analysis, which is likely to result in negative adjustments to these accounts of a material nature, is ongoing. As a result, the Company is not able to file its Annual Report Form 10–K on or before March 31, 1997." |
| April 1, 1997 | McGinley wrote Johnny Walker regarding the completion of the 1996 audit. She noted that many "open items," including the completion of the investigation by Waller Lansden, needed to be finished before an audit report could be issued. McGinley referenced the February 20, 1997, "open items" list given to Mike Tuttle and Jane Livingston. She reiterated that without the completion of those items, BDO would be unable to complete the audit. See Exhibit 421. |
| April 3, 1997 | Ames Davis and Nancy Jones of the Waller Lansden law firm began their investigation. |
| April 4, 1997 | On this date, Waller Lansden first contacted BDO. McGinley faxed Nancy Jones a schedule comparing the in-transit assignments set forth on the December 31, 1994, factor accounts reconciliation with the amounts subsequently reflected on the January, 1995, factor statement. |
| April 8, 1997 | BDO was first informed by Steve Page of Ernst & Young that there were two different versions of the bank reconciliations than those contained in the BDO audit workpapers. Both Billingsley and Walker knew of these documents in late February, 1997. Billingsley had apparently informed Ernst & Young about this one day earlier on April 7, 1997. |
| April 9, 1997 | After being asked to assist in the investigation by Waller Lansden on April 4, 1997, the BDO audit team returned to River Oaks for the first time since being asked to leave by Mike Tuttle on February 20, 1997. |
| April 10, 1997 | Kim Long executed an affidavit wherein she took sole responsibility for creating the false reconciliations. Paragraph 10 of her affidavit provides: "I made these altera- |

tions to the books and records of River Oaks in order to conceal the out-of-balance status of the company's cash account as reflected on its general ledger. The reason I wanted to conceal the out-of-balance status was that I did not want to have to admit that there was an out-of-balance status in the account. The reason I did not want to admit this was that I did not want to admit that I had made a mistake and I did not want to risk my job. In my mind, I did not think that it affected anything other than those accounts for the time period. I never thought about there being anything other than an innocent explanation for why the account was out of balance, in the first place. I guess I thought I had made a mistake somehow, but I did not know how I made the mistake. I did not know how to find out how I made the mistake. Therefore, I did the only thing I knew to do which was to conceal the fact that a mistake had occurred." No where in . her affidavit does she implicate other employees of River Oaks. (Exhibit 153)

| | |
|---|---|
| April 10–11, 1997 | Marlene Rabinowitz, a BDO staff auditor, was dispatched to River Oaks and in a short period of time concluded that the BNY account was "out of balance" approximately $7,195,000.00. This confirmed the information given to McGinley earlier by William McIntosh and Greg Kulikowski of BNY. |
| April 12, 1997 | Billingsley informed Waller Lansden that he had discovered the two versions of the bank reconciliations in February, 1997, and had informed Johnny Walker of this fact about that same time. |
| April 15, 1997 | Cross met with the River Oaks board of directors and informed the board of BDO's concerns about the validity of Kim Long's assertion that she had acted alone in the deception of the auditors. Cross also advised the board that if Long was, indeed, acting alone, then the River Oaks accounting controls were so deficient to the extent that the River Oaks records could be unauditable. |
| April 15, 1997 | This date was the end of the extension period for filing the SEC Form 10-K. |
| April 23, 1997 | McGinley and Cross met with the River Oaks board of directors to discuss the status of the investigation. They presented to the board a version of the "creep sheet" which reflected that the accounting manipulations occurred in 1993 prior to the Initial Public Offering (IPO) in order to "build up" the financial strength of River Oaks. This presentation apparently infuriated several of the members of the board of directors. McGinley and Cross left the meeting and discussed the possibility of BDO's resignation from the audit engagement. |
| April 24, 1997 | McGinley and Cross had a telephone conference with River Oaks directors Pete Boone and Gerald Turner. Boone and Turner indicated that they wanted BDO to continue with the engagement, but felt that they needed to talk to someone who was not "so close" to the situation. Subsequently, Boone and/or Turner conversed with Jack Weisbaum. |
| April 28, 1997 | Cross and McGinley met with Ames Davis, Nancy Jones, Paul Gilbert, and Chase Cole of the Waller Lansden law firm. BDO indicated that it would continue to assist in the investigation, as well as, continue efforts to complete the 1996 audit. However, BDO advised Waller Lansden that it felt that River Oaks' management had been concealing the problem from them for several months. Ames Davis indicated that he thought that Johnny Walker was being less than forthright with both Waller Lansden and BDO. The group developed plans to interview several River Oaks' employees under oath. |
| May 9, 1997 | BDO provided Mike Tuttle a list of items required in connection with the investigation. As of May 22, 1997, several of the items had not been addressed by River Oaks. |

| May 14, 1997 | Walker wrote a letter to NASDAQ stating "...the company is not able to conclude that it has identified, isolated, and quantified each of the adjustments that will be required to the company's current and historical financial statements." |
|---|---|
| May 19, 1997 | Thomas Keenum, a member of the River Oaks' board and the company's General Counsel, wrote to BDO explaining the urgent need to resolve the situation. Keenum assured BDO that the board would take whatever action it deemed necessary in regard to River Oaks' management. Keenum demanded that BDO complete the audit by May 23, 1997, in order that the 10–K could be filed with the SEC. |
| May 29, 1997 | Nancy Jones of Waller Lansden wrote Jim Cross asking specific questions concerning BDO's progress toward resolving the River Oaks' accounting problems. See Exhibit 412. |
| June 4, 1997 | Cross responded to Jones' May 29, 1997 letter stating that BDO had not concluded its inquiry for any particular year. He indicated that BDO was not "comfortable with the systems, the books and records, or the people involved in the systems at this point." See Exhibit 857. |
| June 5, 1997 | BDO resigned from the River Oaks' audit engagement. See Exhibit 38. |
| June 11, 1997 | Waller Lansden submitted to Cross the Form 8–K which had been filed by River Oaks stating that the prior years' financial statements could not be relied upon. See Exhibit 384. |
| June 17, 1997 | Based on the River Oaks' Form 8–K filing, BDO withdrew its previous audit opinions on River Oaks' 1990—1995 financial statements. See Exhibit 44. |

During this period of time, River Oaks alleges that BDO did not act properly in the following respects:

1. That it did not adequately communicate that fraud had been perpetrated in the manipulation of the River Oaks' financial records.

2. That it was not aggressive or prompt enough in bringing the issues to the attention of the River Oaks' audit committee and board of directors.

3. That BDO concealed its audit workpapers from River Oaks and Waller Lansden.

4. That the litigation review performed by BDO partner, Joe Coats, was undertaken only to prevent disclosure of BDO's previous deficient audit practices.

5. That BDO did not rigorously attempt to uncover what had happened in the River Oaks' financial records so that it could complete the 1996 audit.

After carefully reviewing the "time line," set forth hereinabove, this court is of the opinion that BDO acted reasonably and appropriately in each of the areas to which River Oaks complains. The seriousness of the accounting irregularities were promptly brought to the attention of Simons and Walker. Simons, however, was "disengaged," as noted in his testimony, and Walker already knew of the problems, but was not disclosing what he knew to BDO. The fact that Walker had an extramarital affair with Kim Long speaks volumes. In actuality, Walker was an obstacle, not only to BDO, but to River Oaks as well. His insistence on there being an "innocent explanation," when he obviously knew there was none, undermined the intensity of the investigation. The language appearing on the audit committee agenda is likewise telling. Gerald Turner understood what was happening immediately. His comments in his discovery deposition confirm this with clarity. The position taken by some of the River Oaks' board members, that they were woefully uninformed about the seriousness of the accounting manipulations, is somewhat in-

credulous. The warning signals provided by BDO were reasonable and adequate.

Although Eileen McGinley might have suspected irregularities during the first week of February, 1997, her concerns were not actually confirmed until Jack Weisbaum conducted his examination on February 14, 1997. Within ten days, she and Weisbaum met with the River Oaks' CEO and the River Oaks' CFO/COO. Once again, Walker's role became problematic. On March 4, 5, and 6, McGinley and Cross both met with Walker and pressed him to schedule a meeting of the River Oaks' audit committee no later than March 10, 1997. However, in order to accommodate Steve Simons, the meeting was postponed until March 17, 1997. At this meeting, BDO advised the audit committee that if an independent investigator was not employed that they would have to resign from the engagement. According to the expert witnesses, an independent investigation is considered very appropriate. The court recognizes that the deadline for filing the SEC Form 10–K was rapidly approaching. However, there was clearly a need to find out exactly what had happened and who was involved. The court is of the opinion that BDO acted appropriately in moving this matter "up the ladder" in the River Oaks' hierarchy.

Walker was told by McGinley and Cross to consult with the River Oaks' SEC counsel. In reply, Walker indicated that he had talked to General Counsel Thomas Keenum, and had advised him of the irregularities. Walker was told by Keenum that the entire River Oaks' board did not need to be notified until Walker had developed more information.

As stated in the bench opinion issued on February 19, 2001, the court believes that the issue of the "tick marked" and "footnoted" BDO audit workpapers is a "red herring." Actual concern was focused on only two of these workpapers, Exhibits 163 and 167. While these documents may have been helpful to show to which source documents the BDO auditors were vouching during the course of their audits, they would not be more illuminating than the non-tick marked, non-footnoted versions in determining that the underlying reconciliations were manipulated or altered. A cursory examination of the subsequent factor statements for the years in question reveals that the reconciliations were grossly misstated. Walter Billingsley uncovered this with relative ease. The evidence indicates that Eileen McGinley explained the footnotes that were set forth on Exhibit 163 to Walker. Although the issue is disputed, there is the possibility that other BDO workpapers made their way into the hands of Billingsley and Tuttle. Insofar as the workpapers are concerned, the court has seen no evidence of wrongful concealment by BDO.

The BDO workpapers for 1991, 1992, and 1993 were sent to Joe Coats in Orlando to perform the litigation review, which, River Oaks contends was orchestrated to hide BDO's deficient audit practices. Coats completed this review fairly quickly and submitted his report to Scott Univer on April 11, 1997. Not only did he see the manipulations that had occurred in the River Oaks' records, he also detected and reported the deficient audit practices by BDO. Insofar as the BDO workpapers are concerned, Univer indicated that the BDO audit engagement team had the "first call" on these workpapers. Coats' litigation review was secondary. Univer testified, without contradiction, that he never considered withholding the BDO workpapers from River Oaks or Waller Lansden in an effort to protect BDO from litigation exposure. Coincidentally, the River Oaks' expert witness, Mark Murovitz, indicated that he did not see anything sinister about

BDO conducting the litigation review. As such, the court does not perceive this event to be of serious concern.

Insofar as whether BDO aggressively pursued the investigation so that it could determine what had happened and complete the 1996 audit, one must remember that the BDO team was asked to leave the River Oaks' premises on February 20, 1997, by Mike Tuttle. Although the auditors continued to work "off site" on the investigation, they were not asked to return to River Oaks until April 9, 1997. Even so, under these constraints, McGinley and Cross pursued their efforts to push the inquiry to higher levels of authority within River Oaks. The court perceives, however, that having the audit team "off site" for this length of time created problems for the investigation. When invited to return, BDO mobilized its auditing team with additional members and vigorously attempted to solve the outstanding questions. BDO continued these efforts through the months of April and May. Even after learning of Kim Long's confession on April 10, 1997, neither BDO nor Waller Lansden, with the assistance of Ernst & Young, could effectively resolve the issues and conclude the investigation during the ensuing six weeks. The latter factor is indicative that even had BDO been given the opportunity to attack the issues early on, the 1996 audit could not have been completed with an opinion being issued by the SEC Form 10–K filing deadline. As both McGinley and Cross acknowledged in their testimony, they still have not concluded exactly what happened and why since Kim Long has refused to talk further. When they received the letter from Nancy Jones, dated May 29, 1997, they both realized that they were not much further along than when they had actually started. This frustration level led to their decision that BDO had to resign.

One other issue that must be addressed is the applicability of the Private Securities Litigation Reform Act of 1995, which had recently been enacted. This legislation, particularly Section 10–A, placed new responsibilities on firms auditing publically traded companies. Univer indicated that, because of this legislation, BDO was operating in a completely new legal environment. He testified that he was concerned not just for the interest of BDO, but also he wanted to be cautious in protecting the relationship with River Oaks considering the disclosures that might have to be made.

When all of the relevant issues are considered, the court must concur with the expert opinions offered by Michael Odom and Mike Benston to the effect that BDO acted properly, if not above average, in conducting its investigation following the discovery of the accounting irregularities at River Oaks in early 1997. As to these claims, contrary to the plaintiff's allegations set forth in its complaint, the court concludes that BDO was not guilty of professional malpractice, negligence, breach of contract, breach of fiduciary duty, or fraud. This conclusion, of course, does not excuse the deficient auditing practices that occurred in 1991 through 1995, and the effect that they had on the financial statement events which occurred in 1997.

## VII.

*The Claim for Damages Relative to the Allegations of Disparagement and Libel Resulting From the Furniture Today Article, which was Published on September 8, 1997*

As noted earlier, Kim Long admitted that she manipulated the accounting records at River Oaks during 1991 through 1995. In her affidavit, she stated that she acted alone.

The article that appeared in the September 8, 1997 *Furniture Today* edition, which admittedly was attributable to BDO, asserted that "collusive fraud" had been perpetrated by River Oaks' employees. The proof presented by BDO at trial failed to show that anyone participated *directly* with Kim Long at the time that she actually manipulated the various accounting records. However, the proof did show that Walter Billingsley discovered that Long had manipulated the bank account reconciliation for the year ended December 31, 1992, as well as, that she had manipulated the factor accounts receivable reconciliation for the year ended December 31, 1994. Billingsley advised Johnny Walker of these events in late February, 1997. Billingsley did not reveal to anyone else that he had uncovered this information until he told Steve Page of Ernst and Young about the two versions of the bank reconciliation on April 7, 1997. He then informed the Waller Lansden attorneys of these discoveries on April 12, 1997. Throughout the course of the investigation, Walker never revealed to anyone what Billingsley had told him and, in fact, in an interview with Ames Davis and Nancy Jones of Waller Lansden, denied that he had even seen the two versions of the bank reconciliation. In the opinion of the court, this amounts to an intentional "cover up" by Walker during a very critical time. One can only speculate as to what course the investigation might have taken had Walker been forthcoming with the information that had been furnished to him.

In Walker's Rule 30(b)(6) deposition, at pages 631 and 632, he indicated that if anyone had knowledge of Kim Long's activities and did not immediately inform BDO, as the River Oaks' auditors, that person would be guilty of fraud. Walker and River Oaks must now live with this testimony since it was offered as the legal position of River Oaks. Indeed, there were two highly placed officers at River Oaks, Walker, the Chief Financial Officer/Chief Operating Officer, and Billingsley, the Treasurer and former Controller, who knew this information and failed to reveal it. In the opinion of the court, this translates into "collusive fraud."

Insofar as a libel cause of action is concerned, truth is an absolute defense. Walker's admissions in his Rule 30(b)(6) deposition conclusively bind River Oaks to the position that "collusive fraud" did indeed occur. As such, the libel count in the River Oaks' complaint must be dismissed as to all defendants.

## VIII.

*BDO's Counterclaim for Fees and Expenses Incurred in the Remedial Work on the Symix Computer System*

Pursuant to Exhibit 5, an engagement letter dated March 10, 1994, BDO agreed to participate in the Symix computer system implementation project with River Oaks. The objectives for BDO were set forth as follows:

A. To help define an implementation process that will insure a timely and effective installation of the Symix computer system.

B. To assist in managing the overall activity to insure that each task is being done correctly and on schedule.

C. To provide specific technical assistance in selected areas.

BDO was to charge professional fees totaling $125,000.00, which were to be billed on a monthly basis as time was charged to the project. Out of pocket expenses were also to be billed monthly. The initial target date for the completion of the implementation was set as December 31, 1994.

Walter Billingsley, the Treasurer and former Controller at River Oaks, was designated as the project team leader and project manager. Essentially, in these roles, he had primary responsibility for the system's implementation on behalf of River Oaks.

The Symix system is comprised of several modules or units which perform separate functions as parts of the integrated computer system.

Irvin Douglas Jones, who is employed by Grant, Thornton, LLP, was qualified as an expert witness in the design, selection, and implementation of integrated management computer systems. His report was introduced into evidence as Exhibit 5923. Jones indicated that originally River Oaks and BDO planned to implement the Symix system "out of the box," subject only to four modifications. By December 31, 1994, which, as noted hereinabove, was the original "go live" date, River Oaks had requested additional modifications to the software programs, causing the "go live" date to be moved to March 31, 1995, and then subsequently to July 4, 1995.

Jones testified that the testing procedures were important to correctly adapt the separate modules into the integrated system; he described them as follows:

A. Unit testing—This test insures that each individual module will work properly; this was the responsibility of BDO.

B. Integration testing—This test insures that all modules will work together; this was the responsibility of River Oaks.

C. Production volume testing—This test consists of running a comparable volume through the system, at a normally anticipated level of operations, to determine if the integrated system could process the projected volume; this was the responsibility of River Oaks.

River Oaks and BDO agreed to activate Symix on July 4, 1995. On that day, which is referred to herein as the initial "go live" effort, the system failed to function on a fully integrated basis. Some of the modules were operational, but others had to be brought online "piecemeal" during the next succeeding 19 months. Jones indicated that this "go live" attempt failed because the X–REF module, which was to handle overnight scheduling, took too much time to process the volume of transactions. Both River Oaks and BDO were aware that this was a problem module during the earlier stages of the implementation process.

Valerie Kozikowski, a BDO partner, came to River Oaks in November, 1995, to take charge of the Symix project from BDO's perspective. She remained at River Oaks until February 7, 1997, when the system became fully operational. On November 30, 1995, Kozikowski and other BDO representatives met with River Oaks officials to discuss the methodology for completing the Symix project. As a result of this meeting, BDO assumed, with a degree of uncertainty, that an agreement had been reached with River Oaks concerning the fees and expenses that would be incurred by BDO for the remediation effort. BDO's position is set forth as follows:

A. BDO would forego charging River Oaks for the fees and expenses that it would incur in getting the Symix system fully operational for the consideration that River Oaks would not sue BDO for the initial failure of the system.

B. River Oaks and BDO would share "in scope" third party vendor costs on an equal basis.

BDO requested a hold harmless agreement from River Oaks to expressly document the purported agreement not to sue, but Steve Simons indicated that this would

not be necessary. According to memoranda of the meeting prepared by BDO personnel, Simons indicated that it was not River Oaks' intention to sue its auditors. A similar verbal expression was also offered by Johnny Walker. A letter agreement, Exhibit 3014, dated February 21, 1996, was executed by both River Oaks and BDO to the effect that the third party costs would be shared.

Insofar as the remediation work was concerned, River Oaks' position is set forth as follows:

A. Since BDO had acknowledged through comments made by Kozikowski that it had some "shared responsibility" in the Symix failure in the areas of detailed design specifications, as well as, integration testing, that BDO should unilaterally forego its charges for fees and expenses.

B. There was no agreement between River Oaks and BDO that River Oaks would not sue BDO as a result of the initial failure. (The court notes, parenthetically, that this position would clearly impact the "independent auditor" status of BDO in its relationship with River Oaks.)

C. Exhibit 3014, the letter agreement, was a fully integrated contract covering all of the rights, responsibilities, and obligations of the parties concerning the remediation effort.

Prior to presenting its defense at trial to BDO's counterclaim as to this issue, River Oaks offered an ore tenus motion to dismiss the counterclaim pursuant to Rule 52(c), Federal Rules of Civil Procedure. The court made the following conclusions:

A. The proof was insufficient to establish that an agreement had been reached between River Oaks and BDO that BDO would forego charging its fees and expenses for the remediation work in consideration for the promise of River Oaks not to sue BDO for the prior failure of the Symix system. The court examined several exhibits, particularly Exhibits 30, 1094, 1138, and 1139, and concluded that even BDO was not certain that it had secured a binding commitment "not to sue" from River Oaks. The court relied on the fact that River Oaks had specifically declined to execute a written agreement, as well as, that the comments that River Oaks did not intend to sue BDO were merely promissory in nature.

B. Exhibit 3014, the letter agreement, was limited in scope. It did not attempt to address all the parameters of the remedial work, but only encompassed, in very specific terms, the arrangements for sharing costs related to the third party vendors. As such, the court did not permit the expansion of this agreement to the extent that it was determinative of issues that clearly were beyond its purpose.

The court's bench opinion and comments, addressing these issues, are incorporated herein by reference.

John N. Chappin, who was qualified as an expert witness for BDO in financial analysis and damage calculations, testified concerning the computations of the fees and expenses incurred by BDO in the remediation effort as follows:

| | | |
|---|---|---|
| 6/95—7/95 | $ 193,078.59 | Unpaid balance before "go live" attempt |
| 8/95—10/95 | 391,615.63 | Analysis and review of SYMIX problems |
| 11/95—1/97 | 2,044,584.23 | Corrective fees and expenses |
| 2/97—4/97 | 163,983.50 | Corrective fees and expenses |
| Total | $2,793,261.95 | |

| | |
|---|---|
| $ 186,841.00 | Cost sharing paid by BDO |
| (15,000.00) | Less: Equipment returned to BDO |
| (22,000.00) | Less: "Out of Scope" Expenses |
| | |
| $2,943,102.95 | |
| (391,615.63) | Less: Analysis and review fees and expenses (see above) |
| $2,551,487.32 | |
| | |
| $2,267,691.00 | *85% of fees only* |

The fees were reduced by an 85% "realization rate," which takes into account that the persons working on the Symix project were taken away from other BDO engagements where they were realizing this percentage of compensation.

 Whether BDO should be entitled to recover through this counterclaim for the Symix remediation is perplexing. In addition to Kozikowski's statement about "shared responsibility," River Oaks, in defense of the counterclaim, offered testimony to the effect that BDO played a significant part in the Symix failure. Jay Looney, who was qualified as an expert witness for River Oaks in systems implementation, testified that BDO had not exercised sufficient supervisory authority in the areas of detailed design specifications and in integration testing. He indicated that BDO should have deployed more experienced personnel to River Oaks, and that BDO should have been more aggressive in its monitoring role, particularly in the various phases of testing. Exhibit 1677 was introduced as Looney's original report, and Exhibit 4979 was introduced as a copy of his "redlined" report. Other concerns were expressed by Jack Barber, a River Oaks employee, who testified through the introduction of his deposition. While Barber thought that the BDO personnel "on site" were capable, he indicated that BDO pushed the "go live" attempt too soon. Barber thought that more testing was necessary prior to the activation of the entire system.

In response to these comments, BDO offered the expert testimony of Irvin Douglas Jones who was identified hereinabove. Jones confirmed that Walter Billingsley, the Symix project manager for River Oaks, employed Metro Softwares, without the approval of BDO, to develop the detailed design specifications. When Metro's performance proved to be inadequate, Billingsley simply waived the requirement for the specifications. According to Jones, these specifications, which were described as a "roadmap," would have told the "code writers" (programmers) why the X–REF program was not functioning properly.

As noted above, Jones indicated that River Oaks had the responsibility for integration testing and volume production testing. In this context, Kozikowski testified that she was "shocked" to learn, during the discovery deposition of Lloyd Clark, which was taken after this lawsuit was filed, that River Oaks had not performed the volume production testing prior to the "go live" attempt. Kozikowski asserted that the Symix system should never have been activated in the absence of this test being successfully conducted.

The primary reason that River Oaks would like to convince this court that the initial failure of the Symix system was predominately caused by the ineffectiveness of BDO is to justify the denial of BDO's fees and expenses that it incurred during the remediation. BDO's initial position at trial was that, if River Oaks had not sued on the Symix claim, it would not have pursued this counterclaim. The irony of this scenario should not be lost. Had River Oaks not sued on the Symix claim, it could have taken the position, advanced by BDO, that a binding agreement had been reached on November 30, 1995, and that BDO was precluded from seeking its fees and expenses. Of course, River Oaks did not do this. It filed suit and exposed itself to the $2,269,691.00 counterclaim. River Oaks' cause of action on the Symix claim subsequently disintegrated because it could not quantify its damages. For River Oaks, this is unfortunately one episode in a lengthy series of "self destructive" acts.

Maybe BDO truly thought it had forged an agreement with River Oaks after the November 30, 1995, meeting. The court, however, is of the opinion that BDO was only engaging in "wishful thinking." Behind the facade, the court believes that BDO felt that it had some exposure, *at that time,* for the Symix failure. If BDO felt blameless, why would it even begin to negotiate a "not to sue" agreement? BDO did not bill River Oaks on a monthly basis as called for in the original engagement letter, nor did it assert a claim for its fees and expenses until after River Oaks asserted the Symix claim in this litigation. These events all occurred, of course, before Kozikowski learned that River Oaks had not performed the production volume testing.

BDO was put on notice that River Oaks did not consider that an agreement had been reached. In Exhibit 1100, a memorandum prepared by William Osburn to Scott Univer, dated January 3, 1996, Osburn commented as follows: "Johnny (Walker) wondered why Frank (Jacoby) and Monte (Weaver) did not pursue a discussion regarding fees and billing during that meeting." Jacoby and Weaver were BDO partners who had been instrumental in the discussions with River Oaks concerning the Symix remediation effort. Osburn's memorandum, however, can literally be construed in two ways. It can indicate that BDO should have known that there was no commitment from River Oaks not to sue, and, to the contrary, it can show that River Oaks anticipated being charged fees and expenses by BDO.

While there was absolutely no clear meeting of the minds as to whether there was an agreement, as discussed above, BDO went forward, taking a much larger role in the Symix implementation under the leadership of Kozikowski. Ultimately the system was brought online in February, 1997. River Oaks never complained to BDO about its performance in this endeavor and never attempted to reach a contractual understanding as to River Oaks' responsibility for paying BDO's fees and expenses. The management level personnel at River Oaks, particularly Steve Simons and Johnny Walker, were certainly aware of the conversations relative to BDO's foregoing its charges for fees and expenses in consideration for River Oaks foregoing its potential lawsuit. In the opinion of the court, River Oaks made a deliberate decision to "lie in the weeds" and let BDO complete the project knowing full well that monthly billings were not forthcoming. The court now must determine whether BDO is entitled to recover its fees and expenses considering the pros and cons that are attributable to each of these parties.

To summarize this issue, the court makes the following conclusions:

A. There was no legally enforceable contract negotiated between River Oaks and BDO concerning the payment of BDO's fees and expenses in connection with the remediation work on the Symix project. In this context, there was no meeting of the minds that BDO would forego charging its fees and expenses in consideration for River Oaks not suing BDO because of the initial Symix failure.

B. Although BDO had some "shared responsibility" in the Symix failure, the far greater responsibility for the unsuccessful Symix "go live" attempt is attributable to the failure of River Oaks to require detailed design specifications and appropriate integration testing, specifically production volume testing.

C. While both River Oaks and BDO played a "cat and mouse" game with each other, neither attempted to formalize their relationship in remediating the Symix failure. BDO worked continuously without submitting monthly billings, and River Oaks was content to allow this to occur. With all the uncertainties swirling around this project, the court has difficulty understanding why these parties were so equally complacent in defining their respective responsibilities.

D. The court is of the opinion that while BDO is entitled to some compensation for the extensive work performed after the unsuccessful "go live" effort, this compensation should be tempered by the fact that BDO was remiss in not formalizing an agreement with River Oaks. BDO is certainly not a neophyte in matters such as this. BDO did not timely bill River Oaks and waited until River Oaks filed suit before asserting this counterclaim. BDO defends this action by saying that it felt that it had an agreement not to charge if River Oaks did not sue. This position is at best

"shaky," and in the long run "indefensible." As such, the court feels that BDO should be awarded 50% of its counterclaim as "quantum meruit" damages for the remedial work in bringing the Symix system online. This translates to the sum of $1,133,845.50 or one-half of $2,267,691.00.

Judgment will be entered for BDO in this amount.

### IX.

*BDO's Counterclaim for Damages Resulting From the Fees and Expenses Incurred During Its Investigative Work Following the Discovery of Defalcations in the River Oaks' Financial Records in 1997*

This counterclaim is somewhat easier to resolve than the counterclaim discussed above. The investigative work performed by BDO in 1997 was precipitated, in part, by the deficient auditing practices perpetrated by BDO in previous years. BDO's efforts did not unravel the web of manipulations spun by Kim Long in the River Oaks' financial records. BDO could not complete the 1996 audit, it had to withdraw its prior years' audit opinions, and ultimately it had to withdraw from the audit engagement. Although the court has previously concluded that BDO acted appropriately once it learned of the defalcations, it should not recover on this counterclaim because it shares the responsibility for the necessity of the investigation as a result of its failure to detect Long's manipulations earlier. Consequently, the court is of the opinion that this counterclaim in the sum of $170,422.00 should be dismissed.

### X.

*Damage Quantification and Attribution*

The court has already concluded that BDO's deficient audit practices contribut-

ed, at least in part, to some of the financial statement events that occurred in 1997. The most significant questions in this proceeding, however, are whether and to what extent, if any, the financial statement events actually played a role in the downfall of River Oaks or whether River Oaks was already on a path of inevitable destruction. In order to begin to put these questions in perspective, the court will first address the testimony of the expert witnesses employed both by River Oaks and BDO.

A. *Expert Witnesses:*

*Kenneth Naglewski*

Naglewski is a certified turnaround specialist who was formerly employed by Morris Anderson and Associates, a crises management and turnaround company. Naglewski was tendered as an expert witness by River Oaks in turnaround management and vendor relations in turnaround circumstances. He developed the list of the five financial statement events, to-wit:

1. The failure of BDO to complete the 1996 audit.

2. The withdrawal by BDO of its previous audit opinions.

3. The resignation of BDO from the audit engagement.

4. The de-listing of River Oaks by NASDAQ.

5. The unfavorable publicity generated as a result of the *Furniture Today* article which was published on September 8, 1997.

Naglewski testified that the financial statement events caused River Oaks' trade creditors to engage in a "feeding frenzy" which resulted in the "downward spiral" of River Oaks into bankruptcy. Naglewski and Steve Courtade, a consultant also employed by Morris Anderson and Associates, negotiated with vendors who supplied River Oaks in an attempt to "park" existing debts and to put River Oaks on a "dollar for dollar" basis. This, in essence, means in layman's terms that River Oaks would pay for all new orders of raw materials and supplies on a cash or C.O.D. basis. Naglewski's and Coutade's efforts, however, were not successful.

Naglewski was aware of certain economic events that had occurred in River Oaks' recent history, but he gave these events little weight when opining on the cause of River Oaks' downfall. These economic events are listed and discussed more fully hereinbelow. Strangely, Naglewski testified that River Oaks' payment of the Ansin judgment, one of these events, after it was affirmed by the First Circuit Court of Appeals, had a positive effect on River Oaks since $1.6 million, generated from a total of $4,000,000.00 in financing arranged to pay this judgment, was brought into River Oaks as operating capital. The court disagrees with Naglewski's conclusion because it ignores that the remaining $2.4 million, which was utilized to pay the judgment, could have better benefitted River Oaks by also being infused as operating capital. Naglewski also testified that the other events, such as the embezzlement from Gaines Manufacturing Company, and the bankruptcy of Levitz, a substantial customer of River Oaks, had no negative effect. He stated that River Oaks had simply "digested" these events; however, he admittedly had made no cash flow analysis as to the effect of either.

The credibility given to Naglewski's testimony was significantly diminished because he gave little or no weight to the other economic events which this court believes were not so digestible.

*Dr. Gary French*

French was qualified as an expert witness for River Oaks in economics and finance. Exhibit 3036 was received in evidence as his report on the damages sustained by River Oaks as a result of the actions of BDO.

French recognized that the furniture industry was in an three year recession culminating in 1997, which he described as a disastrous year economically for River Oaks.

As a basis for his expert opinion, French first assumed the following:

1. That River Oaks' account irregularities had been discovered and corrected from prior years.

2. That audited financial statements were timely filed in keeping with the findings ultimately set forth in the Horne CPA Group audit opinions.

3. That there was no resignation of BDO, no withdrawal of the prior years' audit opinions, no de-listing of River Oaks by NASDAQ, and no negative publicity resulting from the *Furniture Today* article.

French then constructed a hypothetical "but for" value for River Oaks. He first "normalized" River Oaks' earnings and then developed a comparable multiple to establish its value, advising that this was known as the "comparable company approach" to value. To develop his normalized sales (Exhibit 9 to Exhibit 3036), French averaged River Oaks' actual sales for 1995 and 1996 and arrived at a figure of $132,760,000.00. He then presumed that River Oaks would reduce its excess production capacity that had been built up in 1994 and 1995. In doing so, he calculated his costs of goods sold as a percentage of sales by averaging the actual percentages for 1991, 1992, 1993, and 1994, assuming that these were the years that River

Oaks had its production capacity in order.

French then used a series of ratios from eight allegedly "comparable" companies and compared these ratios to the actual ratios existing at River Oaks. He then developed four multiples which are set forth on Exhibit 11 to Exhibit 3036. On Exhibit 12 to Exhibit 3036, he applied the selected multiples to the "normalized" earnings and derived a "but for" value for River Oaks as $54,490,000.00. (As a comparative number, the court recalls that BNY's Tim Tysinger testified that he thought that River Oaks had a net worth of $35,000,000.00, when BNY began its financing of River Oaks in mid–1996. French's "but for" number is almost $20,000,000.00 higher.)

In order to calculate the damages that he contended were attributable to BDO, French deducted the value of the assets sold by River Oaks, denominated for this analysis as "old" River Oaks, during the pendency of its bankruptcy case, to "new" River Oaks from the aforementioned $54,490,000.00. Depending on the value of the assets transferred, which French testified could be assigned by the court, the range of damages runs from $21,000,000.00 to $31,000,000.00. The $10,000,000.00 difference is attributable to the value assigned as "good will" on the balance sheet of "new" River Oaks.

In addition to the assumptions mentioned hereinabove, French made the following additional assumptions in his evaluation, to-wit:

1. That there would have been no credit crises or "run" on River Oaks by the trade creditors.

2. River Oaks would have been able to obtain an adequate infusion of capital.

3. River Oaks would have been able to align its production capacity, which was then at an excess, with its projected sales.

4. The bankruptcy filing would not have occurred.

5. That Steve Simons would remain as CEO at River Oaks.

6. That Heilig–Meyers would remain as a customer of River Oaks.

In the opinion of the court, these are sizable "ifs."

At one point during his testimony, French indicated that while the Ansin judgment, the embezzlement from Gaines Manufacturing Company, and the Levitz bankruptcy had negative effects on River Oaks, they did not cause the River Oaks bankruptcy. However, on cross-examination, he conceded that had River Oaks had the use of the embezzled funds that were lost at Gaines Manufacturing Company, as well as, the amount of money utilized to satisfy the Ansin judgment that River Oaks might have survived. In the opinion of the Court, these economic events, along with the others, enumerated below, should have been given much more weight by both French and Naglewski.

As pointed out earlier, French, in normalizing the income for River Oaks, extracted numbers from the two highest sales years experienced by the company and compared the average of these two years to the average of costs of goods sold as a percentage of sales for four years in which River Oaks was operating at a significantly lower production capacity. The court understands the rationale behind French's approach, but questions the soundness of the methodology to achieve a realistic "but for" valuation. Bringing the excess capacity in line would be particularly problematic during a period of economic recession in the furniture industry. The prospective purchasers for plant and equipment, who likely would also be furniture manufacturers, would have little motivation to expand their own existing capacities during a market downturn.

The development of a comparable company sample was also a daunting task for French, particularly considering the vagaries that existed at River Oaks. Unlike River Oaks, none of the selected comparables sold "promotional furniture" exclusively, and none utilized the "KD" (knock down) system of manufacturing which, according to William Osburn, was described by Steve Simons as the "kiss of death." While all of the comparables were larger than River Oaks, some were considerably larger in their annual sales volumes. Exhibit 4590 was introduced through French on cross-examination. This document reveals that the ratios utilized by French, as comparables to River Oaks, appeared to be significantly "out of line" for 1995, 1996, and 1997. Indeed, the River Oaks ratios for these years indicated substandard performance compared to the selected comparable companies. Regardless, French insisted that his comparables were similar "economically" to River Oaks. The court, being a bit more pragmatic, believes that comparing Bassett, Furniture Brands, and La–Z–Boy to River Oaks is somewhat of a "stretch."

### Jacques H. Belet, III

Belet, a certified turnaround professional, was offered as an expert witness by BDO in business turnarounds, crises management, and causes of business failures. Belet indicated that there were three primary causes of the demise of River Oaks:

1. Uncontrolled growth.

2. Undercapitalization.

3. Poor leadership.

Belet introduced charts which reflected the following:

1. Costs of goods sold, as a percentage of sales, rose upward from 1994 through 1996.

2. Costs of salaries, general overhead, and administrative expenses, as a percentage of sales, rose upward from 1994 through 1996.

3. Interest costs, as percentage of sales, rose upward from 1994 through 1996.

Belet testified that the aforementioned charts indicated that River Oaks was beginning a downward path before 1995. He indicated that beginning in 1994, River Oaks grew at an unplanned rate with increased debt being utilized to finance the growth. The increased growth led to undercapitalization causing River Oaks to increase its dependence on debt to sustain its day to day operations. Belet pointed out that prior to 1997, River Oaks had accumulated large inventories which were expensive to maintain. The rate at which these inventories were being turned over had declined by almost fifty percent.

Belet stated that River Oaks' management failed to react to what was happening in the furniture industry marketplace. They did not react quickly enough to the excess capacity, the increasing accounts payable, and the increased debt. Exhibit 1263, is a memorandum written from Johnny Walker to Steve Simons, dated January 20, 1995, where Walker recognized that River Oaks was focusing too intently on sales and not enough on margins. Walker stated that if River Oaks did not improve its financial management that the situation could become "lethal."

Belet acknowledged that the financial statement events may have raised "red flags" with River Oaks' trade creditors, but he did not believe that these events caused the River Oaks' downfall. In support of his conclusion, he noted that the 1996 audit opinion was filed by the Horne CPA Group on October 5, 1997, and then later, in November, 1997, the $4,000,000.00 line of credit was obtained to pay the $2.4 million Ansin judgment.

In his report, Exhibit 5921, Belet commented on a memorandum prepared by Steve Courtade of Morris Anderson & Associates. Belet stated that Courtade had listed several items that indicated that River Oaks was destined to fail. Courtade's list, which appears on Exhibits 1463 and 1466, is set forth as follows:

- Accounts Payable was mismanaged;
- There were $1.6 million in held checks;
- A large amount of manual checks were not posted;
- The A/P aging was useless;
- Three separate A/P agings existed;
- Financial statements were 5 months behind;
- The first 2 quarters' 10–Qs were due;
- Multiple accounting and production systems were used;
- A lack of top-down management existed;
- Communication was non-existent with mid-managers;
- There was a lack of commitment and goal meeting;
- Company did not track loan balance and collateral base;
- They did not reconcile factor statements to A/R ledger;
- The temporary staff "got overwhelmed and threw stacks of invoices out";

- The Company may have been duplicating payments to vendors;
- Morale was low;
- Checks promised for overnight delivery were sent out regular mail;
- Unsigned checks were being mailed;
- Checks were sent to the wrong addresses;
- Check registers were printed, then lost; and
- Checks to be mailed were not put in the mail basket.

Belet's opinions were not only informative, they were credible. He convinced this court that River Oaks' "downward spiral" to economic collapse had been placed in motion well before the occurrence of the financial statement events in 1997.

*Mike Benston*

Benston is an audit partner in the Office of General Counsel of Price Waterhouse Coopers. He was qualified as an expert witness for BDO in accounting and auditing practices, the application of Generally Accepted Auditing Standards and Generally Accepted Accounting Practices, as well as, the evaluation of damage claims. He was employed by BDO for the following three assignments:

1. The activities of BDO in 1997 which led to its resignation.

2. Whether or not the audit opinions previously issued by BDO complied with Generally Accepted Auditing Standards.

3. The propriety of the damage calculations undertaken by Dr. Gary French.

Benston indicated that BDO did a "textbook" job in reacting to the situation that unfolded at River Oaks in 1997.

He testified that River Oaks was responsible for producing the financial statements necessary for the quarterly SEC Form 10–Q filings, as well as, for producing the financial statements required for the annual audit and the SEC Form 10K filing. Like Michael Odom, also a BDO accounting practices expert witness, Benston indicated that the BDO audits for 1991 through 1995 complied with Generally Accepted Auditing Standards "taken as a whole." He acknowledged that there were deficiencies in the audits of the bank reconciliations and the factor accounts receivable reconciliations, but stated that these were not "high risk" auditing areas.

Concerning the issue of damages, Benston criticized the methodology utilized by Dr. French as follows:

1. River Oaks was not comparable to the eight other companies which were selected.

2. French presumed that River Oaks would bring its excess capacity in line which never actually occurred.

3. The costs of sales were rising while French assumed that these costs would be brought in line.

4. The annual averaged sales figures utilized by French did not take into account the loss or reduction in the Levitz account and the Heilig–Meyers account. These were two customers that purchased primarily "promotional furniture," and the loss of these accounts would cause the customer base to shift dramatically.

5. Benston indicated that $23,000,000.00 was the appropriate number to accurately reflect the value of assets transferred from "old" River Oaks to "new" River Oaks as opposed to the revised $13,000,000.00 figure that was ultimately utilized by French. Benston stated that a deduction of $10,000,000.00 from the transferred value because it represented

"good will" was inappropriate. After reviewing the order, entered during the administration of the bankruptcy case on March 12, 1999, the court concurs with Benston's position. Paragraph 31 at page 13 of the order recites as follows:

The debtor's operating assets being transferred to Newco in the approximate amount of Twenty-three million dollars ($23,000,0000.00) constitutes a satisfaction and reduction dollar for dollar, for the amount transferred to Newco of BNY's claims against the debtor's estate, and BNY's claim against the estate shall be reduced by the same amount.

Exhibit 5934A–G was prepared by Benston and, in summary, indicated that the value assigned to the transferred assets on the books of "new" River Oaks actually exceeded his calculation of the value of "old" River Oaks. This, would indicate that the plaintiff, "old" River Oaks, sustained no damages that could be attributable to BDO.

Dr. French was called by River Oaks in rebuttal and testified that Exhibit 5934F, prepared by Benston, was conceptually in error because it discounted the value of River Oaks twice rather than only once.

French stated that Benston's Exhibit 5934E was also incorrect because it multiplied the value of "one time events," such as the Ansin judgment, by the cash flow multiple of 8.27, which would result in these "one time events" recurring as a reduction to value over a number of years. The court concurs with French's assessment of this particular exhibit and concludes that Benston was in error in his calculation. Events such as the payment of the Ansin judgment occur only once, and, unlike cash flow, do not regenerate repeatedly over multiple years.

French was also critical of Benston's Exhibit 5934D which utilized River Oaks' actual financial figures for 1995 and 1996 only. French stated that this would not reflect a "but for" environment which contemplates that River Oaks would maintain its sales volumes, reduce its excess capacity, and bring its costs of sales in line. Once again, the court understands the rationale of Benston's methodology. However, the exclusive use of actual numbers from 1995 and 1996, two years in which River Oaks began and continued its "downward spiral," embraces the presumption that River Oaks could never recover from an inevitable plunge into failure.

Considering the actual financial statement numbers that were generated by River Oaks between 1991 and 1996, the methodologies employed by French and Benston would, in the court's opinion, invariably produce polarized results. The court is not satisfied with the efficacy of either approach as being indicative of a reliable value for River Oaks. While French's calculations are mathematically correct, his underlying assumptions are not completely trustworthy or realistic. Benston's methodology, using only 1995 and 1996 figures, would not give River Oaks a plausible chance of recovery; additionally, one of his calculations is economically unsound.

B. *The Financial Downslide of River Oaks*

Thomas D. Keenum, River Oaks' General Counsel, Secretary, significant shareholder, and a member of the board of directors, indicated that River Oaks did not have sufficient capacity for production in 1993 and 1994. This prompted expansion plans beginning with the acquisition of R.O. West, which was opened in Compton, California, in 1994, to primarily serve Heil-

ig–Meyers. River Oaks wanted to avoid the excess shipping charges of transporting furniture from North Mississippi to the West Coast.

In 1994, River Oaks opened Roaring River, a second facility in Pontotoc, Mississippi, which was to manufacture a lower price line of furniture. Also in 1994, River Oaks acquired Gaines Manufacturing Company in McKenzie, Tennessee. A discussion of this misguided adventure is set forth below.

In 1995, River Oaks acquired Silver Oaks Furniture in New Albany, Mississippi, as well as, began construction of the Belden, Mississippi, headquarters facility for centralized cutting and distribution. As a part of the Silver Oaks acquisition, River Oaks sold one of its Pontotoc facilities to Four Star Realty, an entity owned by Keenum and two other River Oaks' board members.

In July, 1996, River Oaks began production of motion furniture in Booneville, Mississippi. It acquired the machinery to manufacture this furniture and then leased a building from the Bank of Mississippi. Because of the nature of this transaction, Keenum did not consider it to be the same as the acquisition of a motion furniture factory.

Keenum indicated that because of a downturn in the furniture economy, River Oaks realized that its capacity constraints had evolved into capacity excesses. The board of directors considered consolidations and cost cutting measures, but these were not timely effectuated.

River Oaks experienced financial losses beginning in the fourth quarter, 1995, that continued throughout the remainder of its existence. The only exception was a one cent per share profit which occurred during the second quarter of 1996. This trend, perhaps, is one of the most revealing factors signaling the ultimate fate of River Oaks.

The testimony of several vendor representatives or representatives of companies that were directly affiliated with vendors was received in evidence by depositions. The witnesses are identified as follows:

1. Virginia Robertson—Credit Administrator at Tietex.

2. Daniel A. Labinger—Credit Manager for Rosenthal & Rosenthal, Inc.

3. Randy Darracott—Finance and Operations Manager for Weyerhaeuser Corporation.

4. Paul F. McIntosh—Vice President of Consumer Financial Services for Master Craft.

5. Sandra East—Vice President of Credit Services for Culp, Inc.

6. John Gaeta—Underwriting Manager for CNA Credit.

7. Peter A. Sobha—Director of Corporate Credit and Collections at Malden Mills.

8. Doyle Ward—Controller at Superior Product Sales. (His "in court" testimony was offered by BDO.)

Most of these individuals were aware of the financial statement events that had occurred in 1997 at River Oaks. However, while they generally considered the financial statement events to be significant "as a whole," their business judgment decisions in dealing with River Oaks were based primarily on River Oaks' ability to adequately service its debts. Consider the following examples:

Peter Sobha indicated that Malden Mills relied on the Altman Z score formula to determine the credit worthiness of River Oaks. Beginning in June, 1996, this index showed that River Oaks was in the "high probability of failure" category. Historically, River Oaks maintained an account with Malden Mills in the sum of

$750,000.00, but ultimately raised this limit to a high of $1.6 million. The receivable from River Oaks was insured at a percentage of the account balance plus a deductible. During 1997, Malden Mills requested substantial payments from River Oaks to reduce the account balance to within the insurable limits.

Sobha indicated that he was not affected, one way or the other, by the article that appeared in *Furniture Today* concerning the statements by BDO that collusive fraud had been perpetrated by River Oaks employees. He added, however, that the River Oaks account limit was reduced in September, 1997, from a level of $1.5 million to $1,000,000.00. Sobha stated that this was based on a combination of the NASDAQ de-listing, the lack of audited financial statements, and slow payments being made by River Oaks.

John Gaeta testified that River Oaks was in a period of financial decline beginning in early 1996. He noted that in the previous year, Heilig Meyers accounted for 15.2% of River Oaks' sales while Levitz accounted for 11.5%. Gaeta observed that the River Oaks costs of sales as a percentage of sales was increasing, as well as, that gross margins were decreasing. He stated that this indicates a weakening of the company's financial ability to pay its creditors. He indicated that in rating accounts he utilized Value Line Investment Income Reports which ranked River Oaks as a below average company for both performance and safety as an investment vehicle. He added that Dunn and Bradstreet rated River Oaks 4A2, which was a *high risk* rating. This rating made insurance coverage for accounts payable by River Oaks more difficult to place. Beginning in 1996, the coverage for the CNA clients, who had accounts with River Oaks, was periodically reduced and then ultimately cancelled.

Randy Darracott at Weyerhaeuser had a mixed reaction to several events:

1. When the River Oaks' credit line was *raised* in July, 1997, Weyerhaeuser was aware that the SEC Form 10–K had not been filed, that BDO had resigned as auditors for River Oaks, and that the 1990—1995 audit opinions had been withdrawn by BDO.

2. Weyerhaeuser began lowering River Oaks credit line in October, 1997. This resulted from a "co-mingling" of events such as the article in *Furniture Today*, the slowness of payments, the lack of a 1996 audit, the reconciliation items that had not been resolved, the de-listing by NASDAQ, and the unaudited financial statements.

3. River Oaks high credit balance with Weyerhaeuser was $890,000.00 in September, 1997. Weyerhaeuser began to work this credit balance down to $500,000.00 and then, in December, 1997, to approximately $400,000.00.

4. Darracott was also concerned about the payment of the Ansin judgment, particularly the effect that it could have on reducing cash flow at River Oaks.

Doyle Ward, a CPA, who is the controller at Superior Products Sales, a supplier of foam and fiber to River Oaks in late 1997 and early 1998, had heard nothing regarding the financial statement events. He indicated that Superior's problems with River Oaks began in January, 1998, when River Oaks issued an insufficient funds check to Superior.

The above examples are typical comments from the representatives of the vendor interests. While the financial statement events raised "red flags," as well they should, the overall concern from the vendors' perspective focused more acutely on the increasing inability of River Oaks to pay its debts.

In his report, Exhibit 5921, Jacques Belet accurately summarized the downslide of River Oaks, to-wit:

Growth creates real financial burdens and resultant lingering stress placed on management, employees, suppliers and customers. The operating year 1994 can best be described as "helter skelter," characterized by the acquisition of Gaines, the opening of River Oaks West, the beginning of a new MIS system, the planning and building of the Belden facility, and the planning of a centralized cutting operation. The projects created financial burdens and stress, which would be a daunting task for an experienced management team, let alone one with the background of ROF's (River Oaks Furniture) management team. ROF was clearly trying to do too much, too quickly, and the act of compressing all of these events into such a short time period set the Company on a collision course with disaster. This is clearly shown by the fact that ROF began losing money in the 4th quarter of 1994 and never recovered.

ROF was clearly undercapitalized as early as 1994 and 1995. The reckless expansion and reorganization efforts, which were being fueled by mismanaged growth placed tremendous stress on its cash flow drivers. ROF's performance was sub-par of its peers as expressed in the data provided by Robert Morris Associates' (RMA) Annual Statement Studies wherein from 70 to 80 competitors within ROF's industry report their financial performance. A review of ROF's operating and balance sheet trends demonstrates that the Company was spiraling out of control as early as 1994. The Company's operating efficiencies and key uses of cash began to deteriorate as early as 1994. ROF's liquidity, coverage, leverage and operating ratios began to fall apart in 1994 and 1995. ROF's unrelenting spending on new operations, property and equipment beginning in 1992 and continuing without pause through 1996 led to its ultimate downfall.

### C. The Timing of the River Oaks Bankruptcy Filing

Although no one mentioned this factor during the trial of this proceeding, the court thinks that the timing, or lack thereof, of the filing of the River Oaks' bankruptcy in March, 1998, is extremely significant. Had River Oaks "bitten the bullet" and filed its Chapter 11 case in August or September, 1997, the "feeding frenzy" of the trade creditors could have been avoided through the protection of the bankruptcy court. The efforts of Kenneth Naglewski and Steven Courtade of Morris Anderson and Associates, which ultimately prove to be unsuccessful, would not have even been necessary. The River Oaks unsecured debt could have been "parked" and the trade creditors could have been put on a "dollar for dollar" basis because of the activation of the automatic stay. By the time that the bankruptcy case was actually filed, in the vernacular of one of the trial witnesses, River Oaks had already "hit the wall."

### D. Quality Control Concerns

A serious problem that existed at River Oaks was the lack of quality control. This was evidenced by the significant number of "charge backs" on the River Oaks' books which was largely caused by the poor quality of goods shipped by River Oaks to its customers.

In what the court perceives to be a "lame" effort to improve quality control, River Oaks employed Dudley Brasher as the corporate director of quality control. He began his employment on October 13,

1995, and was terminated on December 6, 1996. Brasher indicated that River Oaks was experiencing quality problems with its production and noted the following examples:

1. The employees were cutting back on the required stitches to be placed per inch.

2. Cardboard would separate from the wooden frames which caused a "popping" noise.

3. The production employees were utilizing an insufficient number of staples to secure springs to the furniture frames. One of River Oaks' customers, Art Van, complained about the number of insufficient air crown staples per spring because the springs were separating from the frames.

4. Foam seat cushions, which were manufactured at a height of six inches, would collapse to approximately two and one-half inches in only several months of use.

Brasher testified that he prepared quality control recommendations for River Oaks, but these were largely ignored. He was aware of the dilution reports which reflected the "charge backs" from the River Oaks' factor. According to Brasher, the extent of the "charge backs" was significant.

William Osburn was a BDO partner who specialized in quality control. He established a quality control council at River Oaks, but indicated that River Oaks management was generally disinterested, specifically Steve Simons. Osburn was concerned that significant cost savings could be realized if River Oaks would implement better quality controls in its production. He indicated, however, that River Oaks was undisciplined in operational issues. As noted earlier, Osburn recalled that Steve Simons had referred to the KD (knock down) system, designed by John Nail in the latter years of River Oaks' existence, as the "kiss of death."

Osburn observed defective goods scattered throughout the River Oaks' buildings. He noted that foam was being accumulated or stockpiled in trailerloads which indicated that the shipments to River Oaks were not based on current production needs.

The court is of the opinion that the comments of these two witnesses are significant because they demonstrate the haphazard manner in which River Oaks was operating. These comments underscore the testimony, elicited from other witnesses, that River Oaks' management was more concerned with increasing sales volumes than in increasing gross margins.

E. *Other Economic Events*

During his trial testimony, Walter Billingsley confirmed that the following economic events had occurred at River Oaks during the years 1994 though 1996:

1. The acquisitions of R.O. West in Compton, California; Roaring River in Pontotoc, Mississippi; Silver Oaks Furniture in New Albany, Mississippi; and the motion furniture facility in Booneville, Mississippi.

2. The construction in 1995 of the headquarters facility in Belden, Mississippi.

3. The acquisition in 1994 of Gaines Manufacturing Company in McKenzie, Tennessee.

4. The embezzlement in April, 1997, of approximately $947,000.00 from Gaines Manufacturing Company by Greg Hudspeth, through the purported purchase of Italian leather. The funds were actually diverted to a Nigerian "investment scheme." River Oaks was able to recover $300,000.00 from its bonding company and $100,000.00 from a bank in McKen-

zie, Tennessee, resulting in a net loss of $547,000.00.

5. A $500,000.00 fabric loss or theft which was connected to the suicide of former employee, Danny Powell.

6. An Immigration and Naturalization Service (INS) raid at Gaines Manufacturing Company, which resulted in a reduction of approximately 10% of the workforce which apparently was comprised of illegal aliens.

7. The resignation of Rich Favata, the River Oaks' Chief Designer in September, 1995.

8. The affirmation by the First Circuit Court of Appeals of the Ansin judgment in April, 1997, in the sum of approximately $2.4 million.

9. The bankruptcy filing in 1997 of Levitz, a significant customer of River Oaks. (According to the testimony of John Gaeta, in 1995, Levitz accounted for 11.5% of River Oaks' sales.) (According to the testimony of Arvil Stanton, an audit partner with Horne CAP Group, a debt totaling $780,000.00, owed by Levitz to River Oaks, was discharged in the Levitz bankruptcy.)

10. The financial problems experienced by Rhodes before its acquisition by Heilig–Meyers, which subsequently filed its own bankruptcy case. (Again, according to the testimony of Gaeta, in 1995, Heilig Meyers accounted for 15.2% of River Oaks' sales.)

The Ansin judgment bears further explanation. This judgment was the product of a "stock fraud" lawsuit that had been initiated by Harry Ansin, the Estate of Larry Ansin, and the Ansin Foundation against River Oaks, as well as, Thomas Keenum and Steve Simons, individually. It was based on allegations that the named defendants acquired River Oaks' stock from Harry Ansin prior to the 1993 initial public offering (IPO) without adequate dis-

closures. A verdict, which was initially returned in the United States District Court for the District of Massachusetts in April, 1996, was subsequently affirmed by the First Circuit Court of Appeals in April, 1997, in the sum of approximately $2.4 million. According to the testimony of Keenum, pursuant to an agreement with the Ansin Foundation, River Oaks paid interest on this judgment between April, 1997, and November, 1997, at which time the United States Supreme Court denied an application for a writ of certiorari, thus precluding further appeal. In November, 1997, River Oaks obtained financing in the total sum of $4,000,000.00 in order to pay the $2.4 million judgment. The balance of the line of credit was infused into River Oaks for operating capital. The initial verdict in the district court, as well as, the affirmation by the First Circuit Court of Appeals were publicized in *Furniture Today,* as noted in more detail below.

All of the above listed factors, in the opinion of the court, are extremely significant. The fact that they were largely ignored by Naglewski and French has dramatically affected the weight that this court has given to their testimony.

F. *Unfavorable Publicity Generated in Furniture Today Article*

The court has already concluded that the "collusive fraud" article published in *Furniture Today* on September 8, 1997, was not libelous because the facts presented were basically true. As such, no damages can be attributed to the conduct of BDO or the other defendants as a result of this article.

The court would hasten to mention, however, that the most unfavorable publicity focusing on River Oaks in *Furniture Today* would have been generated by the article published on April 28, 1997, bearing

the headline "Appeals Court Upholds River Oaks Fraud Verdict." This, of course, discussed the U.S. Court of Appeals decision which upheld the jury verdict to the effect that River Oaks and two of its officers "fraudulently induced" a former shareholder to sell his shares in River Oaks approximately ten months before an IPO. The article indicated that the $2.4 million total damage award included punitive damages of $25,000.00, assessed against Steve Simons, and punitive damages of $100,000.00, assessed against Thomas Keenum.

### G. The Acquisition and Destruction of Gaines Manufacturing Company

The information that follows was taken from depositions of the following individuals:

1. Ben Gaines, Jr., former President and CEO at Gaines Manufacturing Company.

2. Jeffrey Douglas Johnson, former Plant Manager at Gaines Manufacturing Company.

3. David Emory Thompson, former Sales Manager at Gaines Manufacturing Company.

Gaines Manufacturing Company was established by the father of Ben Gaines, Jr., in Memphis, Tennessee, in the early 1950's. In 1958, Gaines, Sr., moved the manufacturing facility to McKenzie, Tennessee, where the company proved to be very successful. When Ben Gaines, Jr., (hereinafter Gaines), became involved with the company in 1981, it had annual revenues of $9,000,000.00. In the years 1991, 1992, and 1993, the company experienced net sales of $26,000,000.00, $29,000,000.00, and $33,000,000.00, respectively. When certain Nashville based partners decided to exit the company in 1994, Gaines felt that the company had three options: "We could go and do an IPO, buy it ourselves, or sell to a public company, an existing public company." Gaines decided that the most attractive option was to pursue a relationship with a larger public company.

Accordingly, in August, 1994, Gaines Manufacturing Company was acquired by River Oaks. Steve Simons and Johnny Walker told Gaines that they were both happy with the way he ran his business and assured him that Gaines Manufacturing Company would operate as an independent division of River Oaks. Walker sent a memo to Gaines shortly after the sale expressing his support and confidence. A few months later, Simons told Gaines that River Oaks had set target numbers for Gaines Manufacturing to meet for the last quarter of 1994, and the company had done extremely well. Gaines was justifiably surprised when shortly thereafter River Oaks sent John Nail to oversee the manufacturing operations. The entire manufacturing process began to change.

The changes implemented by Nail caused tremendous confusion. As Gaines stated in his deposition: "It just wasn't the way you run a furniture factory,...you had different bosses making different decisions, but the right hand didn't know what the left hand was doing. It just wasn't going to work." Gaines understood and appreciated the "knock down" process of manufacturing furniture. He had no objections conceptually to the process, but he believed that the River Oaks' managerial style of implementing the process lost sight of the key goal of keeping the company profitable.

Gaines became upset when he learned that Rich Favata, the Chief Designer, was leaving River Oaks. He believed that Favata's talent held River Oaks together. He contacted Thomas Keenum and pleaded with him to encourage Favata to stay. However, Gaines felt that Steve Simons

should be terminated. Once Favata left, Gaines wanted to leave River Oaks also. Keenum and Douglas Jumper convinced Gaines to stay by promising him that he would be placed back in charge of the operation with no outside interference. At a meeting held in late 1995 or early 1996, Gaines again voiced his desire to leave River Oaks, but was persuaded once more to stay by Keenum. When asked why he wanted to leave, Gaines stated, "The company...was not a company that I wanted to be associated with. From what I was seeing and how they were dealing with their fiduciary responsibilities to their relationships with their customers, I had no desire to associate my name with that company."

Gaines recounted an incident where David Thompson, at that time the Sales Manager at Gaines Manufacturing, was ordered by Johnny Walker to remove several truck loads of furniture from the premises, bill them to the customers, and then, after the auditors left, return them to the property. Gaines surmised that this was done to artificially increase sales. Thompson acknowledged that he was indeed ordered to move ten trailer loads of furniture "off premises" by Walker. This occurred in late 1994, and involved furniture valued at approximately $110,000.00 to $120,000.00.

Gaines became further concerned with the management style of River Oaks when the second or third inventory was taken. On that occasion, John Nail came to the McKenzie plant a few days early and instructed the cutting department to stay late and cut as much fabric as they could in order to inflate the work in process. This report was substantiated by the testimony of Jeffrey Johnson, the former Plant Manager at the McKenzie facility. Johnson stated that after the acquisition by River Oaks, the methodology of conducting inventory remained the same, but that im-

mediately before taking the inventory, Nail would direct Johnson to "turn the cutters loose."

Thompson also testified about the inflation of work in process. He said, "It was kind of a joke after a while in December, we were going to have two big weeks of cutting and sewing, because Mr. John Nail said that we will have a lot of merchandise in WIP, work in process. And we would go ahead and cut orders way ahead so that the WIP would have a lot more value. And they shouldn't have been done that way, but he wanted to have that WIP at a real, real high level."

Concerning Nail's practice of inflating work in process, Gaines stated, "That's not a way you run a company. At best you are fooling yourself, at worse, you are intentionally fooling somebody else."

Another practice that caused Gaines concern was Nail's desire to create "capitalization costs." Johnson described this as a practice, initiated by Nail, that called for "in-plant" labor to be monitored, followed by the preparation of a "capitalization of labor report." At the end of Nail's first month at the McKenzie plant, Johnson compiled a list of labor costs. He hand delivered the report to Nail, who usually came to the McKenzie facility once a week. Johnson testified that Nail returned the report to him and ordered him to double the labor costs and add 20%. After doing so, he was instructed to give the inflated figures to the accounting department.

When asked to highlight problems that arose after the River Oaks management team took over, Johnson commented that the general attitude concerning costs and spending changed dramatically. Johnson testified, "[I]t became pretty apparent just in a general way when River Oaks came in that you bought what you wanted. If you thought you needed a new piece of equip-

ment, go out and buy it. If something broke, get a new one. That general attitude was pretty prevalent with River Oaks and my exposure to it." This differed significantly from the conservative philosophy employed previously at Gaines Manufacturing Company.

In addition to substantiating the information provided by Gaines and Johnson, Thompson related an incident where Steve Simons told him to place a group of Levitz orders in production priority ahead of all other orders. Thompson argued unsuccessfully against this directive because the orders that were being set aside were much more profitable than the Levitz order. Thompson stated that because of this decision, Gaines began losing its customers because their orders could not be timely delivered.

By the end of 1995, output and profits had fallen dramatically. Ben Gaines, Jr., was terminated by Nail in March of 1996. Shortly, thereafter, Johnson and Thompson voluntarily left the company. After his termination, Gaines arranged financing and attempted to repurchase his former company. River Oaks, in keeping with its self destructive mindset, showed no interest and ultimately was forced to close the facility.

Gaines, Johnson, and Thompson are now the owners of a successful furniture manufacturing company known as New Generations which employs approximately 300 people. Rich Favata, who had the foresight to leave River Oaks, is the company's President.

### H. *Relationship With BNY*

Tim Tysinger, now an Executive Vice President with General Motors Acceptance Corporation, which acquired Bank of New York Financial Corporation (BNY), was the loan officer responsible for BNY's factor lending and asset based lending to River Oaks. He summarized the initial terms of the financing arrangements as follows:

> $42,000,000.00 revolver loan—Advances of 95% on eligible approved accounts receivable and 90% on eligible non-approved accounts receivable; 60% lending based on the value of inventory, including raw materials, work in process, and finished goods.

> $9,000,000.00 term loan.

> $3,000,000.00 over advances credit limit.

The following additional points were extracted from Tysinger during his direct and cross-examination:

1. Tysinger was aware of the Ansin judgment prior to consummating the loan to River Oaks, but thought that River Oaks could absorb this judgment through its net worth.

2. Tysinger first learned of the "dangling debit" problem in mid-February, 1997, and thought that the amount was in the range of $2.7 to $2.8 million. Johnny Walker had advised Tysinger that he thought CIT was the cause of this problem.

3. Tysinger thought that the Levitz bankruptcy had little effect on River Oaks' financial condition. He indicated that a portion of the debt owed to River Oaks by Levitz was assumed by BNY, while the remaining portion was added to the "over advances" loan balance. Tysinger testified that the over advances limit ranged from $3,000,000.00, which was incurred fairly quickly, to a high of $4.5 million, but that this number fluctuated during 1996 and 1997.

4. Tysinger compared his sales projections for River Oaks to the sales that were actually realized as follows:

| Year | Projected Sales | Worse Case Scenario | Actual Sales |
|---|---|---|---|
| 1996 | $144,000,000 | $140,000,000 | $126,000,000 |
| 1997 | $150,000,000 | $143,000,000 | $118,000,000 |

5. Tysinger was aware that the River Oaks' gross margins declined steadily from 1995 to 1998.

6. Exhibit 4468 is a request from River Oaks to BNY for a waiver of the loan covenants. It is dated May 12, 1997, and reflects numerous breaches of the existing agreement.

7. Exhibit 1327 reflects the amounts of interest, fees, and commissions that were paid by River Oaks to BNY during the relatively short time that the BNY financing was "in place." The cumulative total is $10.9 million, which, in the opinion of the court, is substantial.

8. Exhibit 1228, a River Oaks letter to BNY, dated December 19, 1997, indicates that BNY ultimately reduced the percentage of advances on accounts receivable to 80%.

9. BNY's relationship with River Oaks began in 1996 when River Oaks decided to move its financing from CIT. The existing loan balance owed to CIT in the approximate sum of $33,000,000.00 was paid through the BNY loan facility.

According to the testimony of Steve Courtade, in late 1997, despite the mounting financial problems at River Oaks, BNY was still collecting its loan with River Oaks at the rate of $105,000.00 to $110,000.00 per week.

Exhibit 1482 is a memorandum sent by Courtade to Steve Simons on January 22, 1998, listing returned checks totaling $536,300.00. Courtade indicated that BNY decided not to cover these checks.

Jaques Belet, in his report, stated, "[F]inancially strong companies rarely turn to factoring. Factoring is one of the most expensive ways to obtain working capital. Many companies which cannot generate positive cash flow often resort to factoring. ROF's reliance on factoring required it to continue increasing sales without regard to its margins. A decline in sales, for whatever reason, immediately creates a cash flow problem that leads to the demise of a company such as ROF."

It is not difficult to see from the testimony excerpts, set forth above, that Belet's conclusions are precisely correct. BNY was an expensive and demanding lender. When BNY made its decision, which it certainly had the right to do, that it would not continue funding the River Oaks line of credit in an unlimited fashion, the fate of River Oaks was sealed.

## XI.

### CONCLUSIONS

#### A. Contributory Negligence/Comparative Negligence

The court initially read with great interest the assertion by BDO in one of its trial briefs that the doctrine of contributory negligence should apply in this case to bar the claims of River Oaks. While acknowledging that the State of Mississippi has long followed the principle of comparative negligence and was one of the first states to codify this defense, BDO argued that the doctrine was applicable only in actions brought for personal injuries, wrongful death, or for injury to property. If an action were brought to recover purely economic damages, such as the proceeding before this court, BDO argued that, by default, the common law doctrine of contributory negligence rather than comparative negligence should apply.

Under the doctrine of contributory negligence, a plaintiff's cause of action is barred if the plaintiff's own negligence was a contributing factor to the injuries sustained. BDO argued that the evidence

is clear that the negligent or other wrongful acts perpetrated by River Oaks, specifically through Kim Long, contributed to its injuries. Therefore, BDO asserted that River Oaks should be barred from any recovery.

For reference purposes, the Mississippi comparative negligence statute is set forth in full as follows:

**§ 11–7–15. Contributory Negligence No Bar to Recovery of Damages—Jury May Diminish Damages.**

In all actions hereafter brought for personal injuries, or where such injuries have resulted in death, or for injury to property, the fact that the person injured, or the owner of the property, or person having control over the property may have been guilty of contributory negligence shall not bar a recovery, but damages shall be diminished by the jury in proportion to the amount of negligence attributable to the person injured or the owner of the property or the person having control over the property.

Miss.Code Ann. § 11–7–15 (1972).

In support of its argument that comparative negligence principles are designed to be applied only in actions seeking damages for physical harm or injury, BDO cited the Uniform Comparative Fault Act which was approved by the National Conference of Commissioners on Uniform State Laws in 1977 (the "Act"). The 1977 Act replaced an earlier 1955 version which was intended to assist the various state jurisdictions, in moving from contributory to comparative negligence, by providing a model statute. BDO cited the Commissioner's Comment to Section I of the Act, specifically the paragraph relating to the types of harms covered by the Act. BDO, however, glaringly omitted the final critical sentence. The entire paragraph, with the omitted portion highlighted, states as follows:

The specific application of the principle, as provided for in this Act, is confined to physical harm to person or property. But it necessarily includes consequential damages deriving from the physical harm such as doctor's bills, loss of wages, or costs of repair or replacement of property. It does not include matters like economic loss resulting from a tort such as negligent misrepresentation, or interference with contractual relations or injurious falsehood, or harm to reputation resulting from defamation. *But, failure to include these harms specifically in the Act is not intended to preclude application of the general principle to them if a court determines that the common law of the state would make the application.*

Uniform Comparative Fault Act at Historical Note, Section I, Commissioner's Comment thereto (as quoted in *Gustafson v. Benda,* 661 S.W.2d 11, 17–19 (Mo.1983)).

In Mississippi, contributory negligence is not a defense to an action based on fraud. *Baker and Company, Florida v. Preferred Risk Mutual Insurance Company,* 569 F.2d 1347, 1350 (5th Cir.1978); *Reed v. Charping,* 207 Miss. 1, 41 So.2d 11, 12 (1949); *Nash Mississippi Valley Motor Co. v. Childress,* 156 Miss. 157, 125 So. 708, 709 (1930). An action based on fraud is one for purely economic damages which does not involve physical harm to a person or property. Courts, applying Mississippi law, have not been hesitant to apply comparative negligence principles in fraud causes of action. In keeping with the Commissioner's Comment, this court finds that the common law of the State of Mississippi does indeed apply comparative negligence principles in matters involving purely economic loss. Contributory negligence is, therefore, not an available defense in this case. The opinions to the contrary, cited by BDO,

relate entirely to the application of Missouri law and are, therefore, distinguishable.

Having determined that the common law theory of contributory negligence is not an absolute bar to River Oaks' cause of action seeking the recovery of economic damages, the court must now decide what effect should be given to the concept of comparative negligence. In this context, the critical question is whether the court should consider the following comparative factors in determining if River Oaks sustained damages as a result of the negligence attributable to BDO:

1. The defalcations, which were the actual "genesis" of the audit malpractice, were perpetrated by River Oaks' employee, Kim Long.

2. The economic circumstances confronting River Oaks prior to its bankruptcy filing, which specifically includes those issues discussed in Paragraph X, hereinabove, i.e., the financial downslide of River Oaks, the timing of the River Oaks bankruptcy filing, the quality control concerns, the other economic events, the unfavorable publicity generated in the April 28, 1997, *Furniture Today* article, the acquisition and destruction of Gaines Manufacturing Company, and the costly relationship with BNY.

As a corollary to the aforesaid potentially mitigating circumstances, the court must also decide whether the testimony presented by River Oaks quantified its claims for damages within a reasonable degree of certainty.

B. *Audit Interference*

In its most recent memorandum, River Oaks urged the court to follow the "audit interference" doctrine set forth in *National Surety Corporation v. Lybrand,* 9 N.Y.S.2d 554, 256 A.D. 226 (1939). In support of this proposition, River Oaks

cited *Fullmer v. Wohlfeiler & Beck,* 905 F.2d 1394 (10th Cir.1990), setting forth the following quote:

The conclusions of the trial judge are supported by persuasive authority. In *Lincoln Grain, Inc. v. Coopers & Lybrand,* 216 Neb. 433, 345 N.W.2d 300 (1984), a judgment for the defendant public accountants was reversed and the cause remanded for trial on a claim that an audit had not been conducted in accordance with generally accepted auditing standards. In affording guidance for the retrial, the Nebraska court agreed with the views expressed in *National Surety Corporation v. Lybrand,* 256 A.D. 226, 9 N.Y.S.2d 554 (1939), and *Shapiro v. Glekel,* 380 F.Supp. 1053 (S.D.N.Y.1974), and in Hawkins, *Professional Negligence Liability of Public Accountants,* 12 Vand.L.Rev. 797 (1959), and Menzel, *The Defense of Contributory Negligence in Accountants' Malpractice Actions,* 12 Seton Hall 292 (1983), The [Nebraska] court in [Lincoln Grain] stated:

We agree with the view of the *National Surety* and *Shapiro* courts that accountants are not to be rendered immune from the consequences of their own negligence merely because those who employ them may have conducted their own business negligently. Allowing such a defense would render illusory the notion that an accountant is liable for the negligent performance of his duties. We hereby adopt the rule enunciated by the *National Surety* and *Shapiro* courts, and articulated by Hawkins and Menzel [in the articles cited above], that the contributory negligence of the client is a defense only where it has contributed to the accountant's failure to perform the contract and to report the truth. [quoting from 345 N.W.2d at 307.]

Defendants argue that the court's statements demonstrate that the *Lincoln Grain* case was decided under contributory negligence principles, and that the harsh rule of the absolute par of contributory negligence is not the rule now in Utah, [citations omitted]; hence the *Lincoln Grain* opinion and others decided in contributory negligence regimes are inapplicable.

We disagree with this analysis of the *Lincoln Grain* case. While it is true that in the portion of the opinion quoted above, and in statements cited by the defendants, the court referred to contributory negligence, in actuality the case was decided in the context of comparative negligence principles. Earlier in the Nebraska court's opinion there is discussion of the trial court's instruction which did refer to contributory negligence. However, the instruction stated:

> If so, and if such negligence on the part of Lincoln Grain was the proximate or a proximately contributing cause of Lincoln Grain's damage, then *the jury should compare the negligence of both Lincoln Grain and Coopers & Lybrand and otherwise proceed in accordance with the comparative negligence instructions.* [quoting from 345 N.W.2d at 306, with emphasis supplied by the *Fullmer* court]

Of course, there is a fundamental difference between the contributory negligence and comparative negligence doctrines, with the latter avoiding harshness of the absolute bar of contributory negligence. However, we are not convinced that the reasoning in the cases decided in contributory negligence contexts is necessarily inapposite here. Allowing either a comparative negligence or contributory negligence defense would tend to "render illusory the notion that an accountant is liable for the negligent performance of his duties," which is a result rejected by *Lincoln Grain*, 345 N.W.2d at 307. There is force to the reasoning in *Lincoln Grain* and other authorities with respect to both contributory and comparative negligence regimes. The basic reasoning was stated in *National Surety Corporation v. Lybrand*, 9 N.Y.S.2d at 563: "[W]e see no reason to hold that the accountant is not liable to his employer in such cases. Negligence of the employer is a defense only when it has contributed to the accountant's failure to perform his contract and to report the truth."

Not surprisingly, BDO contended that *National Surety* does not establish a universal rule for the consideration of wrongful plaintiff conduct in auditing negligent cases. BDO argued that "virtually all" of the comparative negligence jurisdictions reject the "audit interference" concept and hold that any negligence by the plaintiff/client, whether or not it directly interferes with the auditor's performance of its duties, can *reduce comparatively* the plaintiff's recovery.

BDO cited *Scioto Memorial Hospital Association, Inc. v. Price Waterhouse*, 74 Ohio St.3d 474, 477, 659 N.E.2d 1268 (Ohio 1996); *see, e.g., Federal Deposit Insurance Corp. v. Deloitte & Touche*, 834 F.Supp. 1129, 1144–47 (E.D.Ark.1992); *National Credit Union Administration Board v. Aho, Henshue & Hall*, 1991 WL 174671, *3–*5, 1991 U.S. Dist. LEXIS 12360, *7–12 (E.D.La.1991); *Halla Nursery, Inc. v. Baumann–Furrie & Co.*, 454 N.W.2d 905, 907–09 (Minn.1990); *Capital Mortgage Corp. v. Coopers & Lybrand*, 142 Mich. App. 531, 369 N.W.2d 922, 925 (1985). BDO also cited *Miller v. Ernst & Young*, 938 S.W.2d 313 (Mo.App.1997), which specifically declined to apply the *National*

*Surety* "audit interference" rationale, and *Cenco, Inc. v. Seidman & Seidman,* 686 F.2d 449 (7th Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982).

Without question, Kim Long intentionally manipulated the River Oaks' financial records for at lease five years. In the opinion of the court, these manipulations were not minor, innocent mistakes. Not only did Long alter reconciliations in substantial amounts, she forged the underlying documents to which the BDO auditors were vouching. The lack of supervision at River Oaks permitted Long to perpetrate these acts at will.

Although the evidence failed to show that anyone assisted Long or colluded with her during the time of the actual manipulations, the proof did show that her admitted paramour, Johnny Walker, the Chief Financial Officer/Chief Operating Officer, became aware of her wrongdoing in February, 1997, and purposely did not reveal what he knew to BDO, Waller Lansden, or anyone else. In the opinion of the court, Walker's silence directly hindered and delayed the 1997 investigative efforts.

The combined effect of all of these circumstances is tantamount to "audit interference." Consequently, even if this court did subscribe to the *National Surety* philosophy, i.e., that the level of the client's conduct must equate with "audit interference" before comparative negligence principles can be applied, it would consider the acts of Long and Walker as comparative factors before assessing any damages in this proceeding.

### C. *Proof of Damages Within a Reasonable Degree of Certainty*

In Mississippi, damages which are uncertain, contingent, or speculative are not recoverable. A quote from *Hudson v. Farrish Gravel Co.,* 279 So.2d 630 (Miss.1973), is insightful, to-wit:

Ordinarily, no recovery can be had where resort must be had to speculation or conjecture for the purpose of determining whether or not the damages resulted from the act of which complaint is made, or some other cause, or where it is impossible to say what of any portion of the damages resulted from the fault of the defendant and what portion from the fault of the plaintiff himself.

*Id.* at 635–36. *See also, Ciba–Geigy Corp. v. Murphree,* 653 So.2d 857 (Miss.1994); and *Finkelberg v. Luckett,* 608 So.2d 1214 (Miss.1992).

In subparagraph A., Paragraph X, the court has already commented to an extent about the efficacy of the expert testimony focusing on damages. The court would offer the following additional observations regarding some of the assumptions made by Dr. French in his creation of a "but for" River Oaks, to-wit:

1. That there would have been no credit crisis or "run" on River Oaks by the trade creditors—While the court believes that the 1997 financial statement events were "red flags" for the River Oaks' trade creditors, the court does not think that these events, standing alone, precipitated the "feeding frenzy" that ultimately occurred. There were many, more devastating, factors that contributed to this crisis, particularly the rapidly failing financial strength of River Oaks and its inability to adequately service its debts. Despite the efforts of Kenneth Naglewski and Steven Courtade of Morris Anderson and Associates, the "run" on River Oaks could not be turned around. River Oaks had a viable option to stop this hemorrhaging, through the protection of a bankruptcy filing, but waited much too late to seek this relief.

2. River Oaks would have been able to obtain an adequate infusion of capital—

Efforts were made by William Tyson, Managing Director, Scott and Stringfellow, Inc., throughout 1997, to obtain an additional infusion of funds for River Oaks. He made presentations to numerous potential sources, including Heilig–Meyers, Sanders Morris, and Fournier Gefinor, but achieved no positive results.

The language in the order, entered by this court on March 12, 1999, is also informative as to this assumption, to-wit: "As noted, all efforts for a sale of the company, infusion of capital and financing have failed. . . ." Paragraph 25, page 7.

3. River Oaks would have been able to align its production capacity, which was then at an excess, with its projected sales—The probability of this assumption occurring has been discussed earlier in this opinion. The likelihood of an alignment of sales and capacity within a reasonable time frame, particularly considering that the furniture industry was in an economic downturn, was extremely remote.

4. That Heilig–Meyers would remain as a customer of River Oaks—Heilig–Meyers, whose orders accounted for a significant percentage of the annual River Oaks' sales, experienced its own financial problems and ultimately sought protection through bankruptcy relief.

One can see from the above discussion that French's "but for" domain for River Oaks would never have been realized. The court acknowledges that it is examining Dr. French's assumptions having the advantage of "20–20 hindsight." However, if the improbability of the underlying assumptions leads the court to the conclusion that the hypothetical "but for" status is completely unachievable, then the projected value for River Oaks, which obviously depends on these assumptions having some validity, is meaningless. The court is, therefore, left with no reliable mechanism to quantify damages. If the court thought that River Oaks was entitled to recover from BDO because of the audit malpractice, the court would have to engage in pure conjecture or speculation to select an amount. A jury may sometimes be allowed the discretion to pick a number from thin air; the court cannot.

## D. *River Oaks' Fate was Inevitable*

 The most glaring flaw in River Oaks' position is the inability to recognize that it could not survive the ongoing recession in the furniture industry. Because of its past excesses, undercapitalization, and poor management, River Oaks had already embarked on a downslide to failure. Its condition was terminal. The financial statement events of 1997 were barely noticeable "blips" on the radar screen in comparison to the disastrous economic events that had already happened and were continuing to happen to River Oaks.

Had Kim Long not committed her fraudulent acts and had the "imbalances" in the financial records of River Oaks been corrected from the outset, the opportunities for audit malpractice would not have existed. Under these circumstances, BDO would have, more than likely, timely completed the 1996 audit, issued its audit opinion, and the SEC Form 10–K would have been timely filed before April 1, 1997, or, at least, before the extension date of April 15, 1997. Perhaps the prior years' audit opinions would not have been withdrawn, and, River Oaks would not have been delisted by NASDAQ. The facts, of course, did not unfold in this fashion. Even so, the 1996 audit and audit opinion were subsequently completed by the replacement auditors, Horne CPA Group, on October 5, 1997, and the SEC Form 10–K was filed by October 15, 1997. In addition, replacement audit opinions were filed by Horne

for 1994 and 1995. Thereafter, River Oaks was able to borrow $4,000,000.00 in November, 1997, to pay the Ansin judgment and to use the balance as operating funds.

Although there was clearly a delay from the "best date scenario," April 1, 1997, until October 5, 1997, the date of the Horne filings, all of the financial statement events of 1997 had been remedied, within a period of slightly more than six months, except for the de-listing by NASDAQ. To say that this delay caused the complete collapse of River Oaks, considering all of the other factors that were afoot, is somewhat disingenuous.

Once all of the pertinent circumstances are considered, including the actions of Long/Walker and the perceived inevitable failure of River Oaks, this court concludes that the audit malpractice committed by BDO did not cause damages to River Oaks which are quantifiable to any reasonable degree of certainty. Consequently, the complaint must be dismissed.

An order will be entered consistent with this opinion.

### ORDER

On consideration before the court is the third amended complaint filed by the plaintiff, River Oaks Furniture, Inc., referred to hereinafter as River Oaks, against the defendants, BDO Seidman, BDO Seidman, LLP, Jerome Walsh, Walsh Communications, Inc., Ronald G. Ashby, James B. Cross, Eileen M. McGinley, Leland E. Graul, Jack A. Weisbaum, and Scott M. Univer, referred to hereinafter collectively as BDO; a timely answer, affirmative defenses, and counterclaim having been filed by the said defendants; on proof in open court; and the court, after having heard and considered same, has issued an opinion contemporaneously herewith.

Consistent with the aforementioned opinion, it is hereby ordered and adjudged as follows, to-wit:

### I.

Although the court has concluded that BDO was negligent in the performance of its auditing practices and procedures during the years 1991 through 1995, it is unable to award damages to the plaintiff, River Oaks, because of the principles of comparative negligence and because River Oaks was unable to qualify its damages within a reasonable degree of certainty. As such, the third amended complaint filed by River Oaks is hereby dismissed with prejudice.

### II.

On the basis of the counterclaim filed by BDO seeking its fees and expenses incurred in the remedial work on the Symix computer system, the court hereby awards BDO a judgment for quantum meruit damages against River Oaks in the sum of $1,133,845.50, plus interest to accrue after the entry of this order at the highest rate permitted by law.

### III.

The counterclaim filed by BDO against River Oaks for damages resulting from the fees and expenses, incurred during the investigative work following the discovery of defalcations in the River Oaks financial records in 1997, is hereby dismissed with prejudice.

### IV.

All costs accrued by virtue of this proceeding shall be taxed to the plaintiff.